**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

—————————————————————
OPEN SPACE INSTITUTE, INC.;                    )
OPEN SPACE CONSERVANCY,                    )
INC.; AUDUBON SOCIETY                         )
OF NEW HAMPSHIRE,                             )        **COMPLAINT**
                                                         )
            Plaintiffs,                             )
                                                         )        No. 04-CV-05670 (LP)
            v.                                      )        ECF CASE
                                                         )
AMERICAN ELECTRIC POWER                   )
COMPANY, INC.; AMERICAN                      )
ELECTRIC POWER SERVICE                       )
CORPORATION; THE SOUTHERN                 )
COMPANY; TENNESSEE VALLEY               )
AUTHORITY; XCEL ENERGY, INC.;            )
CINERGY CORPORATION,                         )
                                                         )
            Defendants.                            )
—————————————————————

## NATURE OF THE ACTION

1.      Plaintiffs Open Space Institute, Inc. ("OSI"), Open Space

Conservancy, Inc. ("OSC"), and Audubon Society of New Hampshire ("NH

Audubon") bring this action against Defendant electric power companies under

federal common law and state law to abate Defendants' ongoing contributions to

global warming.

2.      Scientists have concluded that global warming has begun, is

altering the natural world, and will accelerate dramatically in the 21st century

unless carbon dioxide emissions are reduced.  The key contributor to the current

global warming is the emission of greenhouse gases, primarily carbon dioxide

from fossil fuel combustion.  Greenhouse gases trap heat that otherwise would escape from the atmosphere.

3.      By their annual emissions of approximately 650 million tons of carbon dioxide, Defendants are substantial contributors to global warming.  They are the five largest emitters of carbon dioxide in the United States, and are among the largest such emitters in the world.  Collectively, Defendants' emissions constitute approximately one quarter of the United States electric power sector's carbon dioxide emissions, and approximately ten percent of all carbon dioxide emissions from human activities in the United States.

4.      Global warming constitutes a grave public nuisance, interfering unreasonably and substantially with public rights, including, *inter alia*, the rights to use, enjoy, and preserve the aesthetic and ecological values of the natural world.

5.      Plaintiffs are nonprofit land trusts that acquire and maintain ecologically significant and sensitive properties for scientific and educational purposes, and for human use and enjoyment.  They own nature sanctuaries, outdoor research laboratories, wildlife preserves, recreation areas, and open space.

6.      If carbon dioxide emissions continue unrestrained, global warming will accelerate, damaging the ecologically significant and sensitive properties Plaintiffs own.

7.      Specifically, global warming will cause the inundation of low-lying land, destroy hardwood trees, and diminish biodiversity on Plaintiffs' properties.

Plaintiffs acquired and maintain their properties in order to preserve the very ecological values that global warming will diminish or destroy.

8.      The injuries to Plaintiffs' properties will increase with the rate and magnitude of global warming.  In turn, the rate and magnitude of global warming depend on the level of anthropogenic greenhouse gas emissions, primarily carbon dioxide emissions.  Reducing Defendants' carbon dioxide emissions will reduce the injuries and threatened injuries to Plaintiffs' properties from global warming.

9.      Defendants have available to them practical and economically viable options for reducing their carbon dioxide emissions without significantly increasing the cost of electricity to their customers.  Such options include using alternative fuels; improving generation efficiency; increasing generation from zero- or low-carbon energy sources such as wind, solar, and gasified coal with emissions capture; co-firing wood or other biomass in coal plants; employing demand-side management techniques; altering the dispatch order of their plants; and other measures.

10.      Plaintiffs seek judicial relief under the federal common law of public nuisance or, alternatively, under state private and public nuisance law. Specifically, Plaintiffs seek an order (i) holding each Defendant jointly and severally liable for contributing to the ongoing public nuisance of global warming, and (ii) directing each Defendant to cap its emissions of carbon dioxide and then reduce them by a specified percentage each year for at least a decade.

## PARTIES

Plaintiffs

11.     Plaintiff OSI is a not-for-profit corporation organized under the laws of the State of New York.  OSI was formed to help protect the natural environment by, among other means, preserving open space and open land for recreation, conservation, and resource and wildlife protection.  OSI holds and manages interests in real property in order to preserve and enhance those properties' natural and ecological values.  It also assists community organizations that promote environmental protection, including control of harmful air emissions.  The global warming to which Defendants' carbon dioxide emissions contribute threatens OSI's core mission and real property.

12.     Plaintiff OSC is a not-for-profit corporation organized under the laws of the State of New York.  OSC is organized and operated for the exclusive benefit of, and to carry out the purposes of, OSI.  OSC holds and manages lands, and conservation easements on lands, in order to preserve and enhance those lands' natural and ecological values.  OSC has an inventory of land and conservation easements with a book value of approximately $56 million.  The global warming to which Defendants' carbon dioxide emissions contribute threatens OSC's core mission and real property.

13.     Plaintiff NH Audubon is a nonprofit corporation organized under the laws of the State of New Hampshire.  NH Audubon's mission is to protect New Hampshire's natural environment for wildlife and people.  It owns and preserves more than 6,000 acres of sensitive land throughout the state as nature

sanctuaries, on which it provides educational programs for children and adults. NH Audubon conducts biodiversity research, monitors endangered species, and advocates sound public policy on environmental issues.  The global warming to which Defendants' carbon dioxide emissions contribute threatens NH Audubon's core mission and real property.

Defendants

14.     Defendant American Electric Power Company, Inc. ("AEP") is a New York corporation, with its principal place of business located in Columbus, Ohio.  AEP is a registered public utility holding company that owns all outstanding common stock of its domestic electric utility subsidiaries, as well as all outstanding common stock of Defendant American Electric Power Service Corporation ("AEP Service").  Its electric power generating facilities are located in Arkansas, Indiana, Kentucky, Louisiana, Michigan, Ohio, Oklahoma, Tennessee, Texas, Virginia, and West Virginia.

15.     Defendant AEP Service is a New York corporation, with its principal place of business in Columbus, Ohio.  AEP Service is a wholly owned subsidiary of AEP.  On information and belief, on behalf of AEP, AEP Service provides management and professional services, including accounting, administrative, information systems, environmental, engineering, financial, legal, maintenance, and other services to, among others, the electric utility subsidiaries of AEP.

16.     Defendants AEP and AEP Service, through their employees and/or agents, manage, direct, and/or conduct operations relating to the emission of carbon dioxide from fossil fuel-fired electric generating facilities owned and/or

operated by AEP's subsidiaries.  AEP and AEP Service exercise this control through a variety of means, including through their employees' and/or agents' implementation of policies, procedures, and programs relating to global warming generally, to carbon dioxide emissions specifically, to the dispatch of electricity from plants with varying carbon dioxide emissions per unit of energy, and/or to the fuels utilized at each plant.  As a result of such control, AEP and AEP Service are responsible for emitting approximately 220 million tons of carbon dioxide annually.

17.    Such control is evidenced by, for example, various pledges and agreements AEP has made to exercise control over carbon dioxide emissions from the facilities its subsidiaries own or operate, including its participation in the Chicago Climate Exchange; AEP's submission of annual reports to the United States Department of Energy ("DOE") reporting the amount of carbon dioxide emissions avoided or sequestered from facilities owned and/or operated by its subsidiaries; and AEP's agreement in February, 2004 to analyze its ability to comply with proposed national regulation of carbon dioxide emissions that would require reductions in such emissions from plants owned and/or operated by its subsidiaries.

18.    Defendant The Southern Company ("Southern") is a Delaware corporation, with its principal place of business located in Atlanta, Georgia. Southern is a registered public utility company that owns all outstanding common stock of its five major power generating subsidiaries, Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company,

and Savannah Electric and Power Company, with facilities located in Alabama, Florida, Georgia, and Mississippi.

19.     Through its employees and/or agents, Defendant Southern manages, directs, and/or conducts operations relating to the emission of carbon dioxide at fossil fuel-fired electric generating facilities owned and/or operated by its subsidiaries.  Southern exercises this control through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to global warming generally, to carbon dioxide emissions specifically, to the dispatch of electricity from plants with varying carbon dioxide emissions per unit of energy, and/or to the fuels utilized at each plant.  As a result of such control, Southern is responsible for the emission of approximately 171 million tons of carbon dioxide annually.

20.     Such control is evidenced by, for example, Southern's agreement in April, 2004 to analyze the financial impact of proposed emission reduction scenarios, including how Southern would respond to new regulations aimed at mitigating global warming; Southern's submission of annual reports to DOE reporting the amount of carbon dioxide emissions avoided or sequestered from facilities owned and/or operated by its subsidiaries; Southern's admission in its 2003 Environmental Progress Report that because it generates nearly 70 percent of its electricity from coal, it releases large amounts of carbon dioxide, which it recognized as "a greenhouse gas"; and Southern's admission in the same report that "there are concerns" about its emissions of carbon dioxide because of the impact those emissions may be having on global climate.

21.     Defendant Tennessee Valley Authority ("TVA") is a federal corporation, with its principal place of business located in Knoxville, Tennessee.

22.     Defendant TVA directly owns and operates fossil fuel-fired electric generating power plant facilities located in Alabama, Kentucky, Mississippi, and Tennessee, which, together, emit approximately 110 million tons of carbon dioxide annually.

23.     Defendant Xcel Energy, Inc. ("Xcel") is a Minnesota corporation, with its principal place of business located in Minneapolis, Minnesota.  Xcel is a registered public utility holding company that owns all outstanding common stock of four major power-generating subsidiaries, Northern States Power Co. (Wisconsin), Northern States Power Co. (Minnesota), Public Service Company of Colorado, and Southwestern Public Service Co., with facilities located in Colorado, Minnesota, New Mexico, South Dakota, Texas, and Wisconsin.

24.     Defendant Xcel, through its employees and/or agents, manages, directs, and/or conducts operations relating to the emission of carbon dioxide at fossil fuel-fired electric generating facilities owned and/or operated by its subsidiaries.  Xcel exercises this control through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to global warming generally, to carbon dioxide emissions specifically, to the dispatch of electricity from plants with varying carbon dioxide emissions per unit of energy, and/or to the fuels utilized at each plant.  As a result of such control, Xcel is responsible for the emission of approximately 75 million tons of carbon dioxide annually.

25.     Such control is evidenced by, for example, various pledges Xcel has made to exercise control over carbon dioxide emissions from the facilities its subsidiaries own or operate; Xcel's role as a charter member and participant in DOE's Climate Challenge program since 1993; and Xcel's submission of annual reports to DOE reporting the amount of carbon dioxide emissions avoided or sequestered from facilities owned and/or operated by its subsidiaries.

26.     Defendant Cinergy Corporation ("Cinergy") is a Delaware corporation, with its principal place of business located in Cincinnati, Ohio. Cinergy is a registered public utility holding company that owns all outstanding common stock of two major power generation subsidiaries, The Cincinnati Gas & Electric Company and PSI Energy, Inc., with facilities located in Indiana, Kentucky, and Ohio.

27.     Defendant Cinergy, through its employees and/or agents, manages, directs, and/or conducts operations relating to the emission of carbon dioxide at fossil fuel-fired electric generating facilities owned and/or operated by its subsidiaries.  Cinergy exercises this control through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to global warming generally, to carbon dioxide emissions specifically, to the dispatch of electricity from plants with varying carbon dioxide emissions per unit of energy, and/or to the fuels utilized at each plant.  As a result of such control, Cinergy is responsible for the emission of approximately 70 million tons of carbon dioxide annually.

28.     Such control is evidenced by, for example, various pledges and agreements Cinergy has made to exercise control over carbon dioxide emissions from the facilities its subsidiaries own or operate; Cinergy's recent admission of the need to mitigate some of the risk associated with global warming; Cinergy's submission of annual reports to DOE reporting the amount of carbon dioxide emissions avoided or sequestered from facilities owned and/or operated by its subsidiaries; and its agreement in February, 2004 to analyze financial impacts to Cinergy from potential legal limits on carbon dioxide emissions.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

29.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs assert a claim against all Defendants under federal common law.  Subject matter jurisdiction over Plaintiffs' claims against TVA is also proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1337, because TVA is a corporation created by a federal statute regulating commerce.

30.     Subject matter jurisdiction over Plaintiffs' state law claims against all Defendants is proper pursuant to 28 U.S.C. § 1367.  Subject matter jurisdiction over Plaintiffs' state law claims against Defendant TVA is also proper pursuant to 28 U.S.C. §§ 1331 and 1337.

### Venue

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because all Defendants "reside" in this judicial district as that term is defined in 28 U.S.C. § 1391(c) and other law.  Venue is also proper under 28 U.S.C.

§ 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, and/or a substantial part of the property that is the subject of the action is situated in this judicial district.  In the alternative, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3), because there is no district in which the action may otherwise be brought and at least one Defendant may be found in this judicial district.

Personal Jurisdiction

32.    All Defendants engage in tortious conduct outside the State of New York, *i.e.*, the emission of massive quantities of carbon dioxide, causing injury to persons and property within the State of New York.

33.    All Defendants expect or should reasonably expect that their emissions increase the global atmospheric concentration of carbon dioxide and thereby contribute to global warming; interfere with the exercise of public rights, including, *inter alia*, the rights to use, enjoy, and preserve the aesthetic and ecological values of the natural world; and damage or destroy those very aesthetic and ecological values on Plaintiffs' properties, including properties located within the jurisdiction of the Southern District of New York.

34.    Some or all of each Defendant's electric generating facilities supply electricity to the Eastern Interconnection, an interstate power grid that includes New York State and is one of two major power grids interconnecting the entire continental United States, excluding Texas.  Power flowing onto the interstate grid from any location energizes the entire grid and becomes part of a vast pool of energy that constantly moves in interstate commerce.

35.     All Defendants derive substantial revenue from interstate commerce; each individual Defendant has reported 2003 annual revenues ranging from $1.1 billion to $14.5 billion.

36.     Directly and/or through their agents and subsidiaries, all Defendants conduct business in and have substantial additional contacts with New York State, as set forth below.

### AEP and AEP Service

37.     Defendants AEP and AEP Service are New York State corporations that have designated the Secretary of State of the State of New York as their agent for service of process.  Also, AEP Service, as agent for AEP, has contracted to sell power directly or indirectly to New York entities.

### Southern

38.     Among other things:

(a)  Southern owns all of the outstanding common stock of Southern Company Services ("SCS"), a corporation that is registered to do business in the State of New York and, on information and belief, routinely acts as the agent for Southern in New York, rendering services that go beyond mere solicitation and are sufficiently important to Southern that Southern itself would perform equivalent services if no agent were available.  SCS is, in effect, a mere department of Southern.  For example: (i) SCS, on behalf of Southern, has contracted to sell power directly to New York entities and/or consumers; (ii) SCS provides general and design engineering, purchasing, accounting, statistical analysis, financial, tax, information resources, marketing, auditing, insurance,

pension administration, human resources, systems and procedures, and various other services relating to business, operations, and power pool transactions to Southern and, on Southern's behalf, to Southern's operating subsidiaries; (iii) SCS acts as a central dispatcher of power for Southern and, on Southern's behalf, for Southern's operating subsidiaries; (iv) SCS coordinates power allocation on behalf of Southern to provide to the operating companies on a continuous basis the power requirements of their respective service areas; (v) SCS represents the interests of Southern and, on behalf of Southern, of Southern's operating subsidiaries before various agencies, boards, commissions, and courts, including the Federal Energy Regulatory Commission ("FERC"), the North American Energy Standards Board, and the United States Bankruptcy Court for the Southern District of New York; (vi) SCS and Southern share the same business address; (vii) certain individuals have been officers of both SCS and Southern; and (viii) SCS is financially dependent on Southern, by virtue of Southern's guarantees of various SCS notes, leases, and surety bonds;

(b)  From 1993 until 2000, Southern owned all the outstanding stock, and until 2001, 80% of the stock, of Mirant Corporation ("Mirant") (formerly Southern Energy, Inc.), which, in turn, since 1999, has owned and operated, through Mirant Americas Energy Marketing, L.P. (formerly Southern Company Energy Marketing, L.P.) ("Mirant Americas"), eight electric generating facilities located in New York State.  Mirant Americas is registered to do business in New York.  On information and belief, from 1999 to 2001, Mirant and Mirant Americas owned and/or operated those facilities as agents or mere departments of

Southern.  Moreover, as part of Southern's 2001 spin-off of its Mirant subsidiary to the holders of Southern's common stock, Southern agreed to continue providing financial, accounting, engineering, and other services to Mirant;

(c)  From 1999 to 2001, a representative of Southern participated in regular meetings of the System Operations Advisory Committee of the New York Independent System Operator ("NYISO"), which were held in New York;

(d)  Southern is a member of the Clean Air Markets Group ("CAMG").  CAMG acts as an agent in New York State for its members, which are electric power corporations, and, among other things, has litigated and challenged laws regulating air emissions in New York State on behalf of its members;

(e)  Southern has retained a New York advertising agency, and has run television advertisements in New York State to establish its brand-name image; and

(f)  On information and belief, Southern does business in New York through the participation of its officers and employees in industry meetings and seminars held in New York.

TVA

39.    Among other things:

(a)  TVA has contracted to buy power from New York entities;

(b)  TVA holds its annual financial analyst and investor meetings in New York City, and sends its officers and employees to participate in industry meetings and seminars in New York; and

(c) TVA regularly retains the services of New York-based investment banks to underwrite bond offerings on the New York Stock Exchange.

Xcel

40.    Among other things:

(a)  Xcel's wholly owned subsidiary Northern States Power Company ("Northern States"), on information and belief, routinely acts as the agent for Xcel in New York, rendering services that go beyond mere solicitation and are sufficiently important to Xcel that Xcel itself would perform equivalent services if no agent were available, and acts, in effect, as a mere department of Xcel.  For example, Northern States is listed on the June 3, 2004 list compiled by the NYISO of companies authorized to buy and sell electric power in New York State, and acts as Xcel's agent in New York for purposes of buying and/or selling electricity;

(b)  Xcel's former subsidiary NRG Energy, Inc. ("NRG") owned and operated, through its operating subsidiaries, electric generating facilities in New York State as an agent or mere department of Xcel.  NRG rendered services in New York on behalf of Xcel that went beyond mere solicitation and were sufficiently important to Xcel that Xcel itself would have performed equivalent services if no agent had been available.  In 2002, Xcel provided approximately $500 million to NRG in an effort to stave off NRG's bankruptcy.  NRG later filed for Chapter 11 bankruptcy and, pursuant to a court-approved reorganization plan, Xcel paid approximately $752 million to NRG's creditors;

(c)  Xcel buys natural gas on the New York Mercantile Exchange ("NYMEX") in New York City; and

(d)  On information and belief, Xcel transacts business in New York through the participation of its officers and employees in industry meetings and seminars held in New York.

Cinergy

41.    Among other things:

(a)  Cinergy owns Cinergy Services, Inc. ("CSI"), a corporation registered to do business in the State of New York, which, on information and belief, renders services in New York on behalf of Cinergy that go beyond mere solicitation and are sufficiently important to Cinergy that Cinergy itself would perform equivalent services if no agent were available.  CSI is, in effect, a mere department of Cinergy.  For example:  (i) CSI provides various services including centralized dispatch of energy from Cinergy's operating subsidiaries, coordination of power purchases and sales, central planning for new generation, coordinated compliance with environmental regulations, and coordinated transmission services and planning; (ii) CSI represents the interests of Cinergy and Cinergy's operating subsidiaries before Congress, the Securities and Exchange Commission, FERC, the United States Bankruptcy Court for the Southern District of New York, and other governmental bodies; (iii) CSI is listed on the June 3, 2004 list compiled by the NYISO of companies authorized to buy and sell electric power in New York State, and has participated in the NYISO's Management and Business committees; (iv) CSI acts as Cinergy's agent in New

York for purposes of buying and/or selling electricity, and for other business transaction purposes; (v) CSI and Cinergy share the same business address; (vi) Cinergy's Chairman and Chief Executive Officer is also CSI's Chairman and Chief Executive Officer; (vii) on information and belief, CSI is financially dependent on Cinergy;

      (b)  Cinergy owns Cinergy Capital and Trading, Inc. ("CCTI"), a corporation registered to do business in the State of New York, which: (i) is listed on the June 3, 2004 list compiled by the NYISO of companies authorized to buy and sell electric power in New York State, and has participated in the NYISO's Management and Business committees; and (ii) on information and belief, acts as Cinergy's agent in New York for the purpose of buying and/or selling electricity, and for other business transaction purposes; and

      (c)  Cinergy trades electricity futures on the NYMEX in New York City through its agents and subsidiaries, Cinergy Marketing & Trading, L.P., and The Cincinnati Gas & Electric Company.

<u>All Defendants</u>

42.    Defendants AEP, AEP Service, Southern, Xcel, and Cinergy are members of, and play a significant role in, the Edison Electric Institute ("EEI"), an electric power industry trade association.  The current chairman of EEI is the Chairman and CEO of Xcel; the current first vice-chairman is the president and CEO of AEP; the current second vice-chairman is the president and CEO of Cinergy; the immediate past chairman is the president and CEO of Southern; and the immediate past first vice-chairman is the president and CEO of Xcel.

43.     EEI acts as agent for AEP, AEP Service, Southern, Xcel, Cinergy, and its other members on issues relating to global warming and, in this capacity, does business in New York State on their behalf.  EEI also acts as an agent for its members and for TVA in a joint government-industry program relating to global warming and the carbon dioxide emissions from EEI members and TVA. Senior EEI officials have addressed meetings of the New York Society of Security Analysts in New York City, in 1998 and 2003, on the topic of global warming, its members' greenhouse gas emissions, and the members' acknowledged need to move "toward eventually reversing the growth in greenhouse emissions."  On information and belief, the purposes of these presentations were to inform investors in New York's capital markets about the financial impact on EEI member companies of potential actions to control carbon dioxide emissions.  EEI has also launched a print advertising campaign in The New York Times and other publications to assure its investors regarding the financial strength of its member companies.

## **FACTS**

### Greenhouse Gas Emissions

44.     There is a clear scientific consensus that global warming has begun, and that most of the current global warming is caused by emissions of greenhouse gases, primarily carbon dioxide from fossil fuel combustion.  This consensus has been expressed in official reports from United States and international scientific bodies.

45.     For example, the Intergovernmental Panel on Climate Change ("IPCC") concluded in its most recent assessment report, issued in 2001, that "most of the observed warming over the last 50 years is likely to have been due to the increase in greenhouse gas concentrations."  In IPCC parlance, "likely" is a term of art denoting a confidence level of 66-90 percent.  The IPCC is a collaborative scientific effort among the nations of the world to assess the scientific and technical information relevant to global warming, and provides advice on global warming to all 170 nations, including the United States, that are parties to the United Nations Framework Convention on Climate Change.  The IPCC 2001 report is the standard scientific reference on global warming.

46.     In 2001, the United States National Academy of Sciences issued a report on global warming, which stated that the "IPCC's conclusion that most of the observed warming of the last 50 years is likely to have been due to the increase in greenhouse gas concentrations accurately reflects the current thinking of the scientific community on this issue."

47.     In 2003, the American Geophysical Union stated that "[s]cientific evidence strongly indicates that natural influences cannot explain the rapid increase in global near-surface temperatures observed during the second half of the 20th century."

Significance of Carbon Dioxide

48.     Energy from the sun heats the Earth, which re-radiates the energy into the Earth's atmosphere.  Carbon dioxide and other greenhouse gases trap heat in the Earth's atmosphere that would otherwise escape into space.

49.     Carbon dioxide is by far the most significant greenhouse gas emitted by human activity.  In terms of its heat-trapping ability, carbon dioxide from the combustion of fossil fuels accounts for more than 80 percent of all anthropogenic greenhouse gas emissions in the United States.

50.     Carbon dioxide emissions persist in the atmosphere for several centuries, and thus have a lasting effect on climate.  Atmospheric concentrations of carbon dioxide continue to increase as each year's emissions are added to those that came before.  Carbon dioxide levels in the atmosphere have increased by 34 percent since the dawn of the industrial revolution in the 18th century, and more than one-third of the increase has occurred since 1980.  As the IPCC has stated, the current level of carbon dioxide in the atmosphere is higher than at any time in the last 420,000 years, and is likely higher than at any time in the last 20 million years.

51.     The combustion of fossil fuels adds large quantities of carbon (in the form of carbon dioxide) to the atmosphere that otherwise would have remained sequestered deep in the Earth.  Processes on land and in the oceans that remove carbon dioxide from the atmosphere are unable to keep pace with these emissions.  As a result, the natural carbon cycle is out of balance and carbon dioxide levels in the atmosphere are increasing every year.

52.     As the planet warms, the oceans become less efficient at removing carbon dioxide from the atmosphere.  Similarly, the planet reflects less energy from the sun back into space when, as a result of global warming, white, snowy, or icy areas are transformed into darker areas that absorb more solar heat.

Defendants' Carbon Dioxide Emissions

53.     Electric power plants that burn fossil fuels are the largest source of carbon dioxide emissions in the United States.  Such plants emit approximately 2.6 billion tons of carbon dioxide each year.  These emissions constitute approximately 40 percent of all carbon dioxide emitted by human activities in the United States, and approximately ten percent of worldwide anthropogenic carbon dioxide emissions.

54.     Carbon dioxide emissions from the United States' domestic electric power sector increased by more than 24 percent from 1990 to 2001, compared to a 16 percent increase from the economy as a whole.  As DOE projects, carbon dioxide emissions from the electric power sector will increase by an additional 41 percent by the year 2025 if effective action is not taken to restrain such emissions.  This rate of increase would raise the electric power sector's annual emissions to approximately 3.5 billion tons, and is significantly higher than the projected growth rate of carbon dioxide emissions from the economy as a whole over the same period.

55.     Together, Defendants and their operating subsidiaries emit approximately 650 million tons of carbon dioxide each year from the combustion of fossil fuels in plants they own and/or operate.  They are the five largest emitters of carbon dioxide in the United States.  Defendants' emissions alone constitute approximately one-quarter of the United States electric power sector's carbon dioxide emissions, and ten percent of all anthropogenic carbon dioxide emissions in the United States.

56.     Defendants and their predecessors in interest have emitted large amounts of carbon dioxide from the combustion of fossil fuels for at least many decades.  Because the planet's natural systems take hundreds of years to absorb excess carbon dioxide emissions, Defendants' past and present emissions will remain in the atmosphere for many decades, or even centuries.

Current and Projected Global Warming Impacts

57.     Empirical evidence underlies the scientific consensus that global warming has arrived.  Globally, the 1990s was the hottest decade, and 1998, 2002, and 2003 were the hottest years, since thermometer records were first kept in 1861.

58.     As the IPCC has noted, global warming already is causing the retreat of mountain glaciers throughout the world.  It is thawing permafrost and causing a later freezing and earlier break-up of ice on rivers and lakes.  Global warming has resulted in poleward and altitudinal shifts of plant and animal ranges, and the decline of animal and plant populations in many locations throughout the world.  It is largely responsible for the melting of the Arctic sea ice.  This ice, as measured in the summer months, has shrunk by 386,000 square miles over the last 20 years and, if greenhouse emissions are not curtailed, scientists believe it will no longer exist in the summer months later this century.

59.     Glacier National Park already has lost two-thirds of the more than 150 glaciers it had in the 19th century.  At the current rate of global warming, it will have no glaciers at all in approximately 30 years.

60.     Increased ocean water temperature due to global warming already has begun to cause severe damage to the world's coral reefs.

61.     In the absence of restrictions on carbon dioxide emissions, global warming will continue to accelerate.  As the IPCC has stated, global average surface air temperature is projected to warm 2.5 to 10.4 degrees Fahrenheit from 1990 levels by 2100, depending on the level of greenhouse gas emissions and the response of the planet to the increasing buildup of such gases.

62.     According to the IPCC, the projected rate of global warming for the 21st century "is much larger than the observed changes during the 20th century and is very likely to be without precedent during at least the last 10,000 years . . . ."

63.     An increase in the planet's average temperature in the projected range of 2.5 to 10.4 degrees Fahrenheit will constitute an extraordinary shift in world climate, with severe consequences for public health and the environment. These consequences will include increases in heat deaths, ground-level smog, and respiratory diseases; disruption of water supplies; more frequent and severe floods and droughts; disruption of and permanent damage to forests and the ecosystems they support; and accelerated sea level rise, with consequent beach erosion, inundation of low-lying lands and ecologically productive salt marshes and tidal wetlands, and storm surges.

64.     Further, the Earth's climate can undergo an abrupt and dramatic change when a radiative forcing agent, such as carbon dioxide, causes the climate system to reach a tipping point.  Defendants' unrestrained emissions of

carbon dioxide increase the risk of reaching that tipping point, triggering a sudden and potentially catastrophic change in climate.  The rapidity of an abrupt climate shift, which can transpire in a period as short as ten years, would magnify all the adverse effects of global warming by shortening the time ecosystems will have to adapt to changing conditions.

65.    The level and rate of global warming over the next several decades depends principally on the degree of greenhouse gas emissions, primarily carbon dioxide emissions from the combustion of fossil fuels.  Reducing such emissions will prevent, diminish, or delay the harmful effects of global warming.

<u>Special Injuries to Plaintiffs' Property Interests</u>

66.    While the global warming to which Defendants contribute injures the public at large, Plaintiffs suffer special injuries, different in degree and kind from injuries to the general public, as described below.

<u>OSI/OSC Properties</u>

67.    To carry out their mission, OSI and OSC own real property within the State of New York.  They acquire and maintain such properties to preserve specific ecological and natural resources, to spur scientific research and education, and to provide access and enjoyment for the public.  Tens of thousands of people visit these properties annually.

68.    OSI and/or OSC hold interests in many properties whose special ecological value will be diminished or destroyed by the global warming to which Defendants' carbon dioxide emissions contribute.  Among these real property interests are the following:

24

### Dockside

69.     OSC owns in fee simple 26 acres on the eastern bank of the tidal Hudson River, in the Village of Cold Spring, Town of Philipstown, Putnam County, New York.  OSC purchased the property in 1999 for $1.3 million. Approximately 20 acres of the 26-acre property lie under the waters of the Hudson River.  The remaining acreage is low-lying riverfront land.

### Croton-on-Hudson

70.     OSC owns a conservation easement on approximately 17 acres of land along the tidal Hudson River, abutting the estuary of Haverstraw Bay, in the Village of Croton-on-Hudson, Westchester County, New York.  OSC originally acquired this property in fee simple for $1.2 million in 1996.  OSC conveyed the property to the Village of Croton-on-Hudson in 2003, but retained a perpetual conservation easement that restricts development.  The Village now manages the property as a public park, and OSC monitors the property on a yearly basis to ensure compliance with the easement.

### Sam's Point Preserve

71.     OSC owns the 4,700-acre Sam's Point Preserve, located in the Towns of Wawarsing and Shawangunk, Ulster County, New York, which it acquired in November 1997 for approximately $4.8 million.  This property contains the only extensive dwarf pitch pine barrens located on bedrock in the world, as well as extensive stands of upland hardwood trees, including birch and maple.

### Glynwood Farm

72.    OSC owns approximately 260 acres of land in the Hudson Highlands, in the Town of Philipstown, Putnam County, New York, that it acquired for approximately $1.6 million in 1995.  The property contains extensive hardwood forests, including birch and maple.  It is currently leased to The Glynwood Center, a tax-exempt charity, which operates an environmental education program on the property.

### Last Chance Ranch

73.    In December 1993, OSI acquired a conservation easement encumbering approximately 1,400 acres of largely undeveloped real property in the Town of North Elba, Essex County, New York, known as Last Chance Ranch. The property, which is located in the Adirondack Mountains, contains extensive hardwood forest, including birch, maple, and beech.

### NH Audubon Properties

74.    To carry out its mission, Plaintiff NH Audubon owns real property in the State of New Hampshire.  Its primary purposes in acquiring and maintaining such property are to preserve habitat for wildlife and to provide places where people can connect with nature.  All of its properties are open to the public, and many have hiking and snowshoeing trails to facilitate public use and enjoyment of the natural world.

75.    NH Audubon holds interests in many properties whose special ecological value will be diminished or destroyed by the global warming to which

Defendants' carbon dioxide emissions contribute.   Among these real property

interests are the following:

<u>Bellamy River</u>

76.     In Dover, New Hampshire, along the Atlantic coast, NH Audubon

owns 26 acres of land, on which a network of trails winds through mature

hardwood forest to tidal creeks, marshes, and the Bellamy River.   This low-lying

land, which lies at the mouth of the tidal river at Bellamy Cove, is an integral part

of the ecologically productive Great Bay estuary.   The estuary provides breeding

grounds for fishes and wintering habitat for bald eagles.   The property sustains

plant species that are imperiled in New Hampshire.   In addition, the property

contains numerous species of hardwood trees, including red oak, red maple,

black birch, and shagbark hickory.

<u>Brookside</u>

77.     NH Audubon owns 31 acres in the Town of Southampton, on the

coast of the Atlantic Ocean, one mile north of the Massachusetts border.   The

property provides habitat for transition-zone breeding birds, and sustains rare

wetland plants.   The Brookside property also includes stands of hardwood trees

such as maple, oak, birch, ash, and beech.   It has hiking trails to facilitate public

use and enjoyment.

<u>Salt Marshes</u>

78.     NH Audubon owns 220 acres of salt marshes in Hampton,

Hampton Falls, and Seabrook.   These coastal wetlands are one of the rarest

habitat types in New Hampshire, and provide breeding grounds for salt water invertebrates and fish.  They are also a feeding ground for migratory birds.

Chase Property

79.    NH Audubon owns 660 acres of land in Hopkinton, New Hampshire.  A network of trails on the property leads through mixed hardwood forest, marshes, and a large beaver pond.  The property supports diverse wildlife, including a rare Black Gum tree sanctuary.  Researchers have identified 230 species of plants on the property, as well as 32 bird species.  The land includes a range of hardwood trees, including birch, beech, oak, elm, and maple.

Plaintiffs' Special Injuries

80.    Unrestrained global warming will accelerate sea level rise via thermal expansion of seawater and the addition of freshwater by melting of glaciers and ice sheets.  Accelerated sea level rise caused by global warming will continue for hundreds of years.

81.    Sea level rise will raise the level of tidal rivers, including portions of the Hudson River and the Bellamy River.  The Hudson River is tidal from Troy, New York, to its mouth 152 miles downstream at New York Harbor.  The Bellamy River is tidal between Dover, New Hampshire, and its mouth.

82.    Sea level rise caused by global warming will permanently inundate some low-lying property along coasts and tidal rivers, including property that Plaintiffs own or on which they hold conservation easements (collectively, "Plaintiffs' properties").

83.     Surges from coastal storms will be superimposed on a higher sea level due to global warming, and thus cause flooding of a much greater area, including portions of Plaintiffs' properties along coasts or tidal rivers.

84.     Accelerated sea level rise from unrestrained global warming will salinize marshes on Plaintiffs' properties, destroying habitat for fish, migratory birds, and other wildlife that are essential to the purposes for which Plaintiffs acquired and maintain these properties.

85.     Global warming will harm the hardwood forests that give the Northeast its fall colors.  Several species of hardwood trees found on Plaintiffs' properties, including maples, birches, and beeches, will be unable to survive the temperature increases projected to occur as a consequence of unrestrained global warming.

86.     Through smog formation, global warming will diminish or destroy the health of the forests that are central ecological features of Plaintiffs' properties.  Ground-level smog intensifies with rising temperature, and interferes with the capacity of trees to produce and store food, making them more susceptible to disease, insects, other pollutants, and harsh weather.

87.     Given the interconnected nature of ecosystems, the loss or decline of tree species on Plaintiffs' properties will cause the loss or decline of other species inhabiting the same properties, including birds, mammals, and insects that depend for their survival on specific tree species and on each other.

88.     Global warming will diminish or destroy the particular ecological and aesthetic values that caused Plaintiffs to acquire, and cause them to

maintain, the properties they hold in trust.  Defendants' carbon dioxide emissions thus undermine Plaintiffs' special and essential objectives, by interfering with their efforts to preserve ecologically significant and sensitive land for scientific and educational purposes, and for human use and enjoyment.

<u>Reducing Carbon Dioxide Emissions Reduces All Injuries</u>

89.    Reducing carbon dioxide emissions is necessary to postpone, avert, or reduce the injuries described above.  The principal factor in determining the rate and magnitude of future warming is the level of anthropogenic greenhouse gas emissions, primarily carbon dioxide emissions.  The greater the emissions, the greater and faster the temperature change will be, with greater resulting injuries and threatened injuries to Plaintiffs.  The lower the emissions, the smaller and slower the total temperature change will be, with lesser resulting injuries.

90.    Reductions in Defendants' massive carbon dioxide emissions will reduce all injuries and risks of injuries to the public, and all special injuries to Plaintiffs, from global warming.

**CLAIMS FOR RELIEF**

<u>Federal Common Law:  Public Nuisance</u>

91.    Plaintiffs incorporate by reference paragraphs 1 through 90 above.

92.    Defendants' emissions of carbon dioxide from the combustion of fossil fuels at electric generating facilities they own, operate, or otherwise control are causing or contributing to a public nuisance, *i.e.*, global warming.

93.     Defendants' emissions of carbon dioxide, by contributing to global warming, constitute a substantial and unreasonable interference with public rights, including, *inter alia*, the rights to use, enjoy, and preserve the aesthetic and ecological values of the natural world.  In the exercise of those rights, Plaintiffs suffer special injuries from Defendants' contributions to global warming, in that global warming will diminish or destroy the ecological and aesthetic values that caused Plaintiffs to acquire, and cause them to maintain, their ecologically significant and sensitive lands.

94.     Defendants' carbon dioxide emissions are a direct and proximate contributing cause of global warming and of the injuries and threatened injuries Plaintiffs suffer.

95.     Defendants know or should know that their emissions of carbon dioxide contribute to global warming, to the general public injuries such warming will cause, and to Plaintiffs' special injuries.  Intentionally or negligently, Defendants have created, contributed to, and/or maintained the public nuisance.

96.     Defendants, both individually and collectively, are substantial contributors to global warming and to the injuries and threatened injuries Plaintiffs suffer.

97.     Carbon dioxide emissions and the impacts of global warming are inherently interstate in character.  Defendants' emissions of carbon dioxide outside New York and New Hampshire increase the global atmospheric concentration of carbon dioxide, causing or contributing to the global warming that injures and threatens to injure Plaintiffs in New York and New Hampshire.

98.     Defendants could generate the same amount of electricity, while emitting significantly less carbon dioxide, by employing readily available methods, processes, and technologies.

99.     Plaintiffs' injuries and threatened injuries from each Defendant's contributions to global warming are indivisible injuries.

100.    Defendants' emissions of carbon dioxide, if unabated, will continue to contribute to global warming and therefore to Plaintiffs' injuries and threatened injuries.

101.    Plaintiffs' injuries and threatened injuries from global warming are imminent.

102.    Plaintiffs' injuries and threatened injuries from global warming are irreparable, and monetary damages are inadequate to remedy the injuries.

103.    Defendants are jointly and severally liable to Plaintiffs under the federal common law of public nuisance.

<u>State Law:  Private and Public Nuisance</u>

104.    Plaintiffs incorporate by reference paragraphs 1 through 103 above.

105.    In the alternative, if federal common law were not to apply, Defendants are liable to Plaintiffs under the statutory and/or common law of private and public nuisance of each of the states where they own, manage, direct, and/or operate fossil fuel-fired electric generating facilities.

106.    Defendants' emissions of carbon dioxide, by contributing to global warming, constitute a substantial and unreasonable interference with public rights, including, *inter alia*, the rights to use, enjoy, and preserve the aesthetic

and ecological values of the natural world.  In the exercise of those rights,

Plaintiffs suffer special injuries from Defendants' contributions to global warming,

in that global warming will diminish or destroy the ecological and aesthetic values

that caused Plaintiffs to acquire, and cause them to maintain, their ecologically

significant and sensitive lands.

107.   <u>Plants located in Alabama.</u>  Defendants Southern and TVA have

engaged and continue to engage in intentional or negligent conduct that

unreasonably causes hurt, inconvenience, or damage to Plaintiffs' properties,

and/or unreasonably interferes with the public's right to physical comfort and

enjoyment of property, and that causes hurt, inconvenience, or damage to

others, and are therefore liable under the statutory and common law of private

and public nuisance of the State of Alabama.

108.   <u>Plants located in Arkansas.</u>  Defendants AEP and AEP Service

have engaged and continue to engage in intentional or negligent conduct that

unreasonably interferes with the use and enjoyment of Plaintiffs' properties,

and/or violates public rights held in common by the community as a whole, and

are therefore liable under the common law of private and public nuisance of the

State of Arkansas.

109.   <u>Plants located in Colorado.</u>  Defendant Xcel has engaged and

continues to engage in intentional or negligent acts or omissions that

unreasonably interfere with the use and enjoyment of Plaintiffs' properties, and/or

work a substantial annoyance, inconvenience, or injury to the public, and is

therefore liable under the common law of private and public nuisance of the State of Colorado.

110.   Plants located in Florida.  Defendant Southern has engaged and continues to engage in intentional or negligent acts or omissions that unreasonably interfere with or tend to obstruct, or render unsafe and insecure, Plaintiffs' use of their properties, and/or that unreasonably annoy, injure, or endanger the comfort and repose of an entire community or a considerable number of persons, and is therefore liable under the common law of private and public nuisance of the State of Florida.

111.   Plants located in Georgia.  Defendant Southern has engaged and continues to engage in intentional or negligent conduct that unreasonably causes hurt, inconvenience, or damage to Plaintiffs' properties and/or to all persons who come within the sphere of its operations, and is therefore liable under the statutory and common law of private and public nuisance of the State of Georgia.

112.   Plants located in Indiana.  Defendants AEP, AEP Service, and Cinergy have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or interferes with the public's comfortable enjoyment of life or property, and are therefore liable under the statutory and common law of private and public nuisance of the State of Indiana.

113.   Plants located in Kentucky.  Defendants AEP, AEP Service, TVA, and Cinergy have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs'

properties, and/or creates a condition prejudicial to the comfort or property of the citizenry at large, and are therefore liable under the statutory and common law of private nuisance and the common law of public nuisance of the Commonwealth of Kentucky.

114.   Plants located in Louisiana.  Defendants AEP and AEP Service have engaged and continue to engage in intentional or negligent conduct that unreasonably causes damage to and/or substantially interferes with the enjoyment of Plaintiffs' properties and/or the property of others, and are therefore liable under the civil law of private and public nuisance of the State of Louisiana.

115.   Plants located in Michigan.  Defendants AEP and AEP Service have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or with rights held in common by the general public, and are therefore liable under the common law of private and public nuisance of the State of Michigan.

116.   Plants located in Minnesota.  Defendant Xcel has engaged and continues to engage in intentional or negligent conduct that unreasonably obstructs the free use of and specially injures Plaintiffs' properties, apart from any common injury, and/or, in a manner generally affecting the public, is unreasonable and indecent or offensive to the senses, or obstructs the free use of property, and is therefore liable under the statutory and common law of private and public nuisance of the State of Minnesota.

117.   Plants located in Mississippi.  Defendants Southern and TVA have engaged and continue to engage in intentional or negligent conduct that

unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or with rights common to the general public, and are therefore liable under the common law of private and public nuisance of the State of Mississippi.

118.   Plants located in New Mexico.  Defendant Xcel has engaged and continues to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' lands, and/or with rights common to the general public, and is therefore liable under the common law of private and public nuisance of the State of New Mexico.

119.   Plants located in Ohio.  Defendants AEP, AEP Service, and Cinergy have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or with rights common to the general public, and are therefore liable under the common law of private and public nuisance of the State of Ohio.

120.   Plants located in Oklahoma.  Defendants AEP and AEP Service have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or unreasonably annoys, injures, or endangers the comfort and repose of an entire community or a considerable number of persons, and/or have caused, through failure to perform a duty, a condition that annoys, injures, or endangers the comfort and repose of others, and are therefore liable under the statutory and common law of private and public nuisance of the State of Oklahoma.

121.   Plants located in South Dakota.  Defendant Xcel has engaged and continues to engage in intentional or negligent acts or omissions that

unreasonably interfere with the use and enjoyment of Plaintiffs' properties, and/or annoy, injure, or endanger the comfort and repose of an entire community or a considerable number of persons, and is therefore liable under the statutory and common law of private and public nuisance of the State of South Dakota.

122.   Plants located in Tennessee.  Defendants AEP, AEP Service, and TVA have engaged and continue to engage in intentional or negligent conduct that unreasonably annoys or disturbs the free use of Plaintiffs' properties; and/or obstructs the ordinary, reasonable, and/or comfortable use of Plaintiffs' properties; and/or unreasonably interferes with the public's use and enjoyment of public places or with other common public rights; and are therefore liable under the common law of private and public nuisance of the State of Tennessee.

123.   Plants located in Texas.  Defendants AEP, AEP Service, and Xcel have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or with rights common to the general public, and are therefore liable under the common law of private and public nuisance of the State of Texas.

124.   Plants located in Virginia.  Defendants AEP and AEP Service have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or injures an indefinite number of people by creating a condition that interferes with a public right, and are therefore liable under the common law of private and public nuisance of the Commonwealth of Virginia.

125.   <u>Plants located in West Virginia.</u>  Defendants AEP and AEP Service have engaged and continue to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or hurts or inconveniences an indefinite number of persons, and are therefore liable under the common law of private and public nuisance of the State of West Virginia.

126.   <u>Plants located in Wisconsin.</u>  Defendant Xcel has engaged and continues to engage in intentional or negligent conduct that unreasonably interferes with the use and enjoyment of Plaintiffs' properties, and/or substantially or unduly interferes with the use of public places or with the activities of an entire community, and is therefore liable under the common law of private and public nuisance of the State of Wisconsin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants as follows:

A.  Holding each Defendant jointly and severally liable for creating, contributing to, and/or maintaining a public nuisance, *i.e.*, global warming;

B.  Permanently enjoining each Defendant to abate its contribution to the nuisance by requiring it to cap its emissions of carbon dioxide and then reduce them by a specified percentage each year for at least a decade; and

C.  Granting such other relief as the Court deems just and proper.

Dated:  July 21, 2004

Respectfully submitted,


_____s/_____
Mitchell S. Bernard (MB 5823)
Nancy S. Marks (NM 3348)
Sean P. Baldwin (SB 9850)
Lawrence M. Levine (LL 2994)
Natural Resources Defense Council, Inc.
40 West 20th Street
New York, New York 10011
(212) 727-2700


Of counsel:
Matthew F. Pawa
Law Offices of Matthew F. Pawa, P.C.
1280 Centre Street, Suite 230
Newton Centre, MA 02459
(617) 641-9550


Christopher A. Amato (CA 8501)
79 North Pearl Street
Albany, New York 12207
(518) 694-3325


Attorneys for Plaintiffs