Steven M. Bierman, Esq. (SB-6615)
Patrick M. McGuirk, Esq. (PM-8365)
SIDLEY AUSTIN BROWN & WOOD LLP
787 Seventh Avenue
New York, New York 10019

        -and-

Angus Macbeth, Esq. (AM-5112)
Joseph R. Guerra, Esq. (*to be admitted pro hac vice*)
Thomas G. Echikson, Esq. (*to be admitted pro hac vice*)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, NW
Washington, DC 20005

*Attorneys for Defendants American Electric Power Company, Inc.,
American Electric Power Service Corp., and Cinergy Corp.*
*Counsel Continued on Next Page*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF CONNECTICUT, ET AL., | : |
| Plaintiffs, | : |
| v. | : 04 CV 05669 (LAP)(DFE) ECF CASE |
| AMERICAN ELECTRIC POWER COMPANY, INC., ET AL., | : |
| Defendants. | : |

| | |
|---|---|
| OPEN SPACE INSTITUTE, INC., ET AL., | : |
| Plaintiffs, | : |
| v. | : 04 CV 05670 (LAP)(DFE) ECF CASE |
| AMERICAN ELECTRIC POWER COMPANY, INC., ET AL., | : |
| Defendants. | : |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINTS FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR FAILURE TO STATE A CLAIM <u>UPON WHICH RELIEF CAN BE GRANTED</u>

Shawn Patrick Regan
HUNTON & WILLIAMS LLP
200 Park Avenue, 43rd Floor
New York, New York 10166
(212) 309-1000

-and-

F. William Brownell
Norman W. Fichthorn
Allison D. Wood
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC 20006-1109
(202) 955-1500

-and-

Peter S. Glaser
TROUTMAN SANDERS LLP
401 Ninth Street, NW, Suite 1000
Washington, D.C. 20004-2134
(202) 274-2950

-and-

Mary K. McLemore
Jaime L. Theriot
TROUTMAN SANDERS LLP
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
(404) 885-3534

*Attorneys for Defendant The Southern Company*

Harriet A. Cooper
Edwin W. Small
Frank H. Lancaster
Todd L. Fulks
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902

*Attorneys for Defendant Tennessee Valley Authority*

Patrick G. Broderick
JONES DAY
222 E. 41st Street
New York, New York  10017-6702

     -and-

Thomas E. Fennell
Michael L. Rice
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201

*Attorneys for Defendant Xcel Energy Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................ 3

ARGUMENT ................................................................................................................. 9

I.     THIS COURT LACKS JURISDICTION OVER THE COMPLAINTS WHICH
FAIL TO STATE ANY CLAIM UNDER FEDERAL LAW. ..................................... 10

     A.    Because There Is No Federal Common Law Cause Of Action To Sue For
Global Warming, The Complaints Fail To State Any Claim For Relief. ............. 11

          1.    Separation-of-powers principles preclude recognition of a federal
common law cause of action to redress global warming. ........................ 12

          2.    The courts have not already recognized a federal common law
cause of action for global warming. .......................................................... 18

          3.    Congress has displaced any federal common law cause of action
that might otherwise be available to address global climate change. ....... 21

     B.    Because Plaintiffs Have Failed To State A Federal Claim For Relief, This
Court Lacks Subject Matter Jurisdiction. .......................................................... 27

     C.    Plaintiffs Have Failed To Allege Facts Sufficient To Establish Article III
Standing. ............................................................................................................ 28

          1.    Plaintiffs allege no actionable injury-in-fact. ........................................... 28

          2.    Plaintiffs do not, and cannot, adequately allege causation. ..................... 31

          3.    Plaintiffs do not, and cannot, adequately allege redressability. ............... 33

     D.    There Is No Basis for Exercising Supplemental Jurisdiction. .............................. 38

II.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED. ............................ 39

     A.    Plaintiffs' State Law Nuisance Claims Are Preempted Because They
Interfere With The Political Branches' Integrated Foreign And Domestic
Policy Response To Global Warming. .................................................................. 39

          1.    Plaintiffs' claims conflict with U.S. foreign policy on global
warming. .................................................................................................... 39

2. Plaintiffs' claims conflict with the regulatory method to global warming that Congress has chosen. ........................................................ 44

B. Plaintiffs Have Failed To State A Claim For Nuisance Under State Law. ........... 46

CONCLUSION ............................................................................................................. 49

# TABLE OF AUTHORITIES

## CASES

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
96 N.Y.2d 280, 750 N.E.2d 1097 (2001).................................................................................46

*Alexander v. Sandoval*,
532 U.S. 275 (2001)..................................................................................................................19

*Allen v. Wright*,
468 U.S. 737 (1984).................................................................................................33, 35, 36, 37

*American Ins. Ass'n v. Garamendi*,
123 S. Ct. 2374 (2003)...................................................................................................... *passim*

*American Well Works Co. v. Layne & Bowler Co.*,
241 U.S. 257 (1916)..................................................................................................................27

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) .....................................................................................................29

*Bell v. Hood*,
327 U.S. 678 (1946)..................................................................................................................11

*Bennett v. Spear*,
520 U.S. 154 (1997)..................................................................................................................31

*Blair v. Anderson*,
570 N.E.2d 1337 (Ind. Ct. App. 1991)......................................................................................46

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 343 (1988)..................................................................................................................38

*Castellano v. Board of Trs. of Police Officers' Variable Supplements Fund*,
937 F.2d 752 (2d Cir. 1991) .......................................................................................................4

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)..................................................................................................................14

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948)............................................................................................................15, 17

*Cincinnati v. Beretta U.S.A. Corp.*,
768 N.E.2d 1136 (Ohio 2002)...................................................................................................46

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
801 N.E.2d 1222 (Ind. 2003) .................................................................47

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .............................................................................29

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ...............................................18, 19, 22, 25, 26

*Copart Indus., Inc. v. Consolidated Edison Co.*,
41 N.Y.2d 564, 362 N.E.2d 968 (1977) .........................................47

*County of Suffolk v. First Am. Real Estate Solutions*,
261 F.3d 179 (2d Cir. 2001) ...............................................................4

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000) ..............................................42, 43, 44, 45

*Davis v. Passman*,
442 U.S. 228 (1979) ...........................................................................11

*De Jesus v. Sears, Roebuck & Co.*,
87 F.3d 65 (2d Cir. 1996) .................................................................31

*Desiderio v. National Ass'n of Secs. Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999) ...............................................................9

*Erie R.R. v. Tompkins*,
304 U.S. 64 (1938) .............................................................................12

*Feathercombs, Inc. v. Solo Prods. Corp.*,
306 F.2d 251 (2d Cir. 1962) ...............................................................4

*Finch v. Swingly*,
348 N.Y.S.2d 266 (App. Div. 4th Dep't 1973) .............................47

*Florida Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) .....................................................31, 32

*Fulani v. League of Women Voters Educ. Fund*,
882 F.2d 621 (2d Cir. 1989) ............................................................33

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000) ..........................................................................45

*Georgia v. Tennessee Copper Co.*,
206 U.S. 230 (1907)............................................................................20

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985) ...............................................................9

*Greenberg v. Bush*,
150 F. Supp. 2d 447 (E.D.N.Y. 2001) ..................................................31

*Greentree at Murray Hill Condo. v. Good Shepherd Episcopal Church*,
550 N.Y.S.2d 981 (Sup. Ct. 1989).......................................................47

*Guardians Ass'n v. Civil Serv. Comm'n*,
463 U.S. 582 (1983).............................................................................11

*Hall v. State, Mich. Dep't of Highways & Transp.*,
311 N.W.2d 813 (Mich. Ct. App. 1981) ...............................................47

*Highview N. Apartments v. County of Ramsey*,
323 N.W.2d 65 (Minn. 1982)...............................................................47

*Hines v. Davidowitz*,
312 U.S. 52 (1941)...............................................................................39

*Illinois v. City of Milwaukee*,
406 U.S. 91 (1972)...........................................................18, 19, 20, 27

*Illinois v. Outboard Marine Corp.*,
680 F.2d 473 (7th Cir. 1982) ...............................................................22

*International Paper Co. v. Ouellette*,
479 U.S. 481 (1987).............................................................................40

*Jaghory v. New York State Dep't of Educ.*,
131 F.3d 326 (2d Cir. 1997) .................................................................9

*Jones v. Ford Motor Credit Co.*,
358 F.3d 205 (2d Cir. 2004) ...............................................................38

*LaFleur v. Whitman*,
300 F.3d 256 (2d Cir. 2002) ...............................................................32

*Leaf River Forest Prods., Inc. v. Ferguson*,
662 So.2d 648 (Miss. 1995).................................................................46

*Leeds v. Meltz*,
85 F.3d 51 (2d Cir. 1996) ........................................................31

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973)................................................................36

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................28, 29, 30, 31, 34

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000) ......................................................9, 10

*Marcus v. AT&T Corp.*,
138 F.3d 46 (2d Cir. 1998) ........................................................38

*Maryland v. Louisiana*,
451 U.S. 725 (1981)................................................................39

*Massachusetts, et al. v. EPA*,
No. 03-1361 (D.C. Cir. Oct. 23, 2003) ...........................................24

*McConnell v. FEC*,
124 S. Ct. 619 (2003)...........................................................29, 30

*Members for a Better Union v. Bevona*,
152 F.3d 58 (2d Cir. 1998) ........................................................27

*New England Legal Found. v. Costle*,
666 F.2d 30 (2d Cir. 1981) ........................................................23

*New York v. FERC*,
535 U.S. 1 (2002)..................................................................15

*New York v. New Jersey*,
256 U.S. 296 (1921)................................................................12

*Nowak v. Ironworkers Local 6 Pension Fund*,
81 F.3d 1182 (2d Cir. 1996) ......................................................38

*O'Melveny & Myers v. FDIC*,
512 U.S. 79 (1994)........................................................12, 13, 18, 19

*Oetjen v. Central Leather Co.*,
246 U.S. 297 (1918)................................................................17

*Olmsted v. Pruco Life Ins. Co.*,
283 F.3d 429 (2d Cir. 2002) ........................................................11

*Samuels v. Air Transp. Local 504*,
992 F.2d 12 (2d Cir. 1993) .........................................................10

*Shain v. Veneman* ,
376 F.3d 815 (8th Cir. 2004) ......................................................30

*Simon v. Eastern Ky. Welfare Rights Org.*,
426 U.S. 26 (1976)................................................................35, 36

*Smith v. Local 819 I.B.T. Pension Plan*,
291 F.3d 236 (2d Cir. 2002) ....................................................9, 448

*Sosa v. Alvarez-Machain*,
124 S. Ct. 2739 (2004)......................................................13, 17, 19

*State v. Wright Hepburn Webster Gallery, Ltd.*,
314 N.Y.S.2d 661 (Sup. Ct. 1970), *aff'd*,
323 N.Y.S.2d 389 (App. Div. 1st Dep't 1971) .............................47

*Tarshis v. Riese Org.*,
211 F.3d 30 (2d Cir. 2000) .......................................................9, 10

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)....................................................12, 13, 15, 20

*Tipler v. McKenzie Tank Lines*,
547 So.2d 438 (Ala. 1989)..........................................................46

*United States v. Eagleboy*,
200 F.3d 1137 (8th Cir. 1999) ......................................................4

*United States v. Gehl*,
852 F. Supp. 1150 (N.D.N.Y. 1994)................................................4

*United States v. Oswego Barge Corp. (In re Oswego Barge Corp.)*,
664 F.2d 327 (2d Cir. 1981) ...................................................22, 25

*U.S. EPA ex rel. McKeown v. Port Authority*,
162 F. Supp. 2d 173 (S.D.N.Y.), *aff'd*,
23 Fed. Appx. 81 (2d Cir. 2001)..................................................34

*Warth v. Seldin*,
422 U.S. 490 (1975)..........................................................28, 36, 37

*Weiler v. Chatham Forest Prods., Inc.*,
370 F.3d 339 (2d Cir. 2004) .................................................................................23

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)...............................................................................................29

## STATUTES AND RULE

Energy Security Act, Pub. L. No. 96-294, tit. VII, 94 Stat. 611 (1980) ....................................5, 25

Pub. L. No. 101-549, 104 Stat. 2399 (1990).....................................................................23

Pub. L. No. 101-624, 104 Stat. 3359 (1990).................................................................6, 25

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776.................................6, 25

Pub. L. No. 105-276, 112 Stat. 2461 (1998)............................................................7, 16, 41

Pub. L. No. 106-74, 113 Stat. 1047 (1999)..............................................................7, 16, 41

Pub. L. No. 106-377, 114 Stat. 1441 (2000)............................................................7, 16, 41

15 U.S.C. §§ 2901 *et seq.*.................................................................................5, 24
    § 2901...........................................................................6, 15, 16, 25
    §§ 2931-2938....................................................................................5, 25
    § 2932.................................................................................................5
    § 2933.................................................................................................5
    § 2936.................................................................................................5
    § 2952.................................................................................6, 16, 25

28 U.S.C. § 1331.....................................................................................10, 27
    § 1337.................................................................................................27
    § 1367.................................................................................................38

42 U.S.C. § 7403(g)..........................................................................23, 24, 26
    § 7411...............................................................................................23
    § 7516-7651o....................................................................................23
    § 7661-7661f....................................................................................23
    § 7671a(e).................................................................................23, 24

Fed. R. Civ. P. 19......................................................................................35

## REGULATION

68 Fed. Reg. 52922 (Sep. 8, 2003) ........................................................................ *passim*

## LEGISLATIVE HISTORY

H.R. 2663, 102d Cong. (1991)..................................................................................26

H.R. 5966, 101st Cong. (1990)................................................................................25

S. 1224, 101st Cong. (1989) ....................................................................................25

S. Res. 98, 105th Cong. (1997)..................................................................6, 16, 41

House Debate (May 23, 1990), *in* 2 Comm. on Env't & Pub. Works, 103d Cong., *A Legislative History of the Clean Air Act Amendments of 1990* (Comm. Print 1993).........................24

## OTHER AUTHORITIES

16 *Moore's Federal Practice* (3d ed. 2004).............................................................38

Memorandum from Robert E. Fabricant, EPA Gen. Counsel, to Marianne L. Horinko, Acting Administrator (Aug. 28, 2003) ...............................................................14

Nat'l Energy Policy Dev. Group, *National Energy Policy Report* (May 2001).....................14, 15

IPCC, *Climate Change 2001: The Scientific Basis* (2001) ...............................................8

Working Group III, IPCC, *Summary for Policymakers: Climate Change 2001: Mitigation* (2001), *in* IPCC, *Climate Change 2001: Synthesis Report* (2001)................................36

*Restatement (Second) of Torts* (1979).......................................................46, 47

Transcript, *President Bush Discusses Global Climate Change* (Jun. 11, 2001), *available at* http://www.whitehouse.gov/news/releases/2001/06/20010611-2.html ........................7, 16, 40, 41

1 *Weinstein's Federal Evidence* (2d ed. 2004) ................................................................4

UNFCCC Homepage, *at* http://unfccc.int (last visited Sep. 30, 2004)....................................6, 16

UNFCCC, *Kyoto Protocol* (Dec. 11, 1997), *available at* http://unfccc.int/resource/docs/convkp/kpeng.pdf................................................6, 16

UNFCCC, *The Convention and Kyoto Protocol*, *at* http://unfccc.int/resource/convkp.html (last visited Sep. 30, 2004) .................................................................................7

UNFCCC, *Text of Convention* (May 9, 1992), *available at* http://unfccc.int/resource/docs/convkp/conveng.pdf....................................................40

## PRELIMINARY STATEMENT

Through these lawsuits, eight States, the City of New York, and three nonprofit land trusts ask this Court to usurp the role and responsibilities of Congress and the President and establish a piecemeal response to the international phenomenon of global warming.  As the U.S. Environmental Protection Agency ("EPA") has observed, "[i]t is hard to imagine any issue in the environmental area having greater 'economic and political significance' than regulation of activities that might lead to global climate change."  68 Fed. Reg. 52922, 52928 (Sep. 8, 2003).  Recognizing that any response to the issue of global warming entails a complex assessment of competing considerations—including potential harms to the nation's economy, its security, and its relations with the rest of the world—Congress has passed a number of statutes in which it has mandated research and information-gathering concerning possible global climate change.  In each instance, Congress has affirmatively chosen *not* to regulate carbon dioxide emissions to address global climate change.  At the same time, three separate administrations have engaged in diplomatic efforts to establish a multilateral framework for addressing this global issue.  Evidently dissatisfied with the pace and results of the democratic process, plaintiffs improperly seek to create a new area of federal common law and, through vague maxims of equity jurisprudence, to establish carbon dioxide emissions standards for operations outside their own States that Congress and the Executive Branch have repeatedly declined to adopt.

Although plaintiffs' complaints attracted widespread attention in the media, those complaints should enjoy a very brief life in the courts.  Well-established separation-of-powers principles squarely foreclose recognition or enforcement of a federal common law cause of action to redress global warming.  Under our system of government, only the political branches of the federal government have the investigative capabilities and constitutional responsibility to

weigh and appraise the complex competing policy considerations that must inform any response to the asserted risks of global climate change. The Constitution does not entrust such policy decisions to the unelected judiciary. Moreover, the very fact that Congress has repeatedly addressed this subject—and chosen each time to collect data and analyze the problem, rather than authorize regulation—confirms that any conceivable authority federal courts might have had to address this problem using federal common law has been displaced.

Not only are plaintiffs unable to allege any valid federal claim, they lack standing to seek redress for global warming. Their complaints allege a litany of speculative risks of future harms, none of which is sufficiently imminent to create a case or controversy under Article III. Perhaps more fundamentally, because of the nature of global warming itself, plaintiffs cannot allege that the five utilities they have singled out to sue are the cause of the alleged future harms they seek to forestall, or that any relief granted against these five defendants will redress the risk of those harms. Indeed, legally meaningful reductions in carbon dioxide emissions can be achieved only if a wide range of international and domestic activities are regulated, including activities within the jurisdiction of each of the governmental plaintiffs. The need for such a society-wide—indeed, world-wide—response to the issue of global climate change underscores the fundamental problem with these lawsuits: any response to global warming can be fashioned only by the political departments of the federal government.

These defects mandate dismissal of the complaints in their entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Because plaintiffs have failed to allege any valid federal claim within the subject matter jurisdiction of this Court and lack standing to bring their claims, there is no valid basis for exercising supplemental jurisdiction over their make-weight state law nuisance claims. If the Court were to reach the merits of

plaintiffs' state law claims, it would have to dismiss them as well: those claims are preempted because they are plainly inconsistent with the integrated domestic and foreign policies the political branches of the federal government have chosen to address global warming, and plaintiffs fail in any event to allege a valid claim for nuisance under state law.

In the final analysis, plaintiffs are seeking relief in the wrong forum. Congress is the branch of government empowered to craft any regulatory response to the issue of global climate change, and the President and the Senate can, respectively, negotiate and ratify treaties establishing an international response to this global phenomenon. Plaintiffs, which include seven States represented in Congress, cannot short-circuit the democratic process and ask this Court to create regulatory measures that they are unable to persuade a majority of Congress to enact.

## BACKGROUND

Plaintiffs in the state action (No. 04-CV-05669) are the States of Connecticut, New York, California, Iowa, New Jersey, Rhode Island, Vermont, and Wisconsin and the City of New York. States Compl. ¶¶ 7-15. Plaintiffs in the private party action (No. 04-CV-05670) are three nonprofit land trusts that acquire and maintain property for scientific, educational and recreational purposes. Open Space Institute ("OSI") Compl. ¶¶ 5, 11-13. Both complaints seek to create federal common law, or, in the alternative to use state nuisance law, to abate what plaintiffs describe as the "public nuisance" of "global warming." States Compl. ¶ 1; OSI Compl. ¶ 1.

1.     **Global Warming and the Federal Government's Response.** As its name suggests, global warming (sometimes referred to as global climate change) is an alleged "'increase in global near-surface temperatures observed during the second half of the 20th

century.'"  States Compl. ¶ 81 (quoting a 2003 statement by the American Geophysical Union).

Plaintiffs allege that "[t]here is a clear scientific consensus that global warming has begun and

that most of the current global warming is caused by emissions of greenhouse gases, primarily

carbon dioxide from fossil fuel combustion." *Id.* ¶ 79; OSI Compl. ¶ 44.  Significantly, carbon

dioxide and other greenhouse gas emissions from all parts of the world contribute to this "global

process."  States Compl. ¶ 155.  Such emissions "rapidly mix in the atmosphere and cause an

increase in the atmospheric concentration of carbon dioxide *worldwide*." *Id.* (emphasis added).

EPA has explained that carbon dioxide "is emitted globally and has relatively homogenous

concentrations around the world," and it is "extremely difficult to evaluate the extent over time

to which *effects in the U.S.* would be related to anthropogenic [*i.e.*, man-made] *emissions in the

U.S.*"  68 Fed. Reg. at 52927 (emphases added).[1]

According to plaintiffs, global warming "already has begun to alter the climate of the

United States."  States Compl. ¶ 3; *see also* OSI Compl. ¶ 2.  Although they list a number of

alleged current *effects* of global warming, such as reduced Arctic sea ice in the summer and

increased ocean water temperatures, States Compl. ¶¶ 83-84; OSI Compl. ¶¶58, 60, plaintiffs

---

[1] In ruling on a Rule 12(b)(1) or 12(b)(6) motion, this Court can, of course, consider formal pronouncements by Executive Branch agencies and officials, federal laws and resolutions, and proposed federal legislation.  *See County of Suffolk v. First Am. Real Estate Solutions*, 261 F.3d 179, 190 n.5 (2d Cir. 2001) (judicial notice of pending legislation); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (judicial notice of public documents); *Castellano v. Board of Trs. of Police Officers' Variable Supplements Fund*, 937 F.2d 752, 754 (2d Cir. 1991) ("judicial notice of all pertinent statutory material"); *Feathercombs, Inc. v. Solo Prods. Corp.*, 306 F.2d 251, 253. n.1 (2d Cir. 1962) (judicial notice of the "ordinary reports of . . . executive departments"); *United States v. Gehl*, 852 F. Supp. 1150, 1163 n.2 (N.D.N.Y. 1994) (judicial notice of statutes); *United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999) (judicial notice of "publicly-available policy statements of" federal agency); *see also* 1 *Weinstein's Federal Evidence* § 201.12[13], at 201-50 to -51 (2d ed. 2004) (court may take judicial notice of government records and actions, including government regulation, and decisions of administrative agencies).

4

stop short of alleging any current *injury* they are suffering. Instead, their allegations of harm to themselves and their citizens are repeatedly phrased in terms of future effects that global warming "will," "is expected to," or "threatens" to cause "in the next 100 years." *See, e.g.,* States Compl. ¶¶ 107, 110, 121; OSI Compl. ¶¶ 58, 61, 63. According to plaintiffs, a "low-end scientific *projection* of a 2.5 degree Fahrenheit increase in global average temperature in the next 100 years" will cause a future increase in "heat deaths," "suffering from asthma and other respiratory diseases," and the "likelihood of drought," as well as future disruptions of, or damage to, water supplies, forests and ecosystems. States Compl. ¶ 95 (emphasis added); *see also* OSI Compl. ¶ 63. Similarly, plaintiffs allege that a "high-end scientific *projection* of a 10.4 degree Fahrenheit increase in global average temperature in the next 100 years would greatly magnify all of these consequences." States Compl. ¶ 96 (emphasis added). *See also id.* ¶¶ 103-46 (alleging injuries that States and their citizens will suffer from global warming); OSI Compl. ¶¶ 63, 80-88 (alleging injuries that private parties will suffer).

The nature and magnitude of these alleged risks of future harm have prompted a variety of actions by Congress and the Executive Branch. As early as 1978, Congress established a "national climate program" to improve understanding of global climate change through research, data collection, assessments, information dissemination, and international cooperation. *See* National Climate Program Act of 1978, 15 U.S.C. §§ 2901 *et seq.* Two years later, in the Energy Security Act, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (1980), Congress directed the Office of Science and Technology Policy to engage the National Academy of Sciences in a study of the "projected impact, on the level of carbon dioxide in the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities" authorized by the Energy

Security Act.  In 1990, Congress enacted the Global Change Research Act, 15 U.S.C. §§ 2931-

2938, which established a 10-year research program for global climate issues, *id.* § 2932,

directed the President to establish a research program to "improve understanding of global

change," *id.* § 2933, and provided for scientific assessments every four years that "analyze[]

current trends in global change," *id.* § 2936(3).  Congress also established a program to research

agricultural issues related to global climate change, Pub. L. No. 101-624, tit. XXIV, § 2402, 104

Stat. 4058, 4058-59 (1990), and, two years later, it directed the Secretary of Energy to conduct

several assessments related to greenhouse gases and report to Congress.  Energy Policy Act of

1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002.

In the Global Climate Protection Act of 1987, Congress directed the Secretary of State to

coordinate U.S. negotiations concerning global climate change.  *See* 15 U.S.C. § 2901 note; *see*

*also id.* § 2952(a) (directing the President and Secretary of State in 1990 to "initiate discussions"

with other nations for agreements on climate research).  As a result of those negotiations,

President George H. W. Bush signed, and the Senate approved, the United Nations Framework

Convention on Climate Change ("UNFCCC"), which brought together a coalition of countries to

work toward a coordinated approach to address the international issue of global warming.  *See*

UNFCCC Homepage, *at* http://unfccc.int (last visited Sep. 30, 2004).  Following ratification of

the UNFCCC, member nations negotiated the Kyoto Protocol, which called for mandatory

reductions in the greenhouse gas emissions of developed nations.  *See* UNFCCC, *Kyoto Protocol*

(Dec. 11, 1997), available at http://unfccc.int/resource/docs/convkp/kpeng.pdf.

Although President Clinton signed the Kyoto Protocol, it was not presented to the Senate,

which formally expressed misgivings over the prospect that the economic burdens of carbon

dioxide reductions would be shouldered exclusively by developed nations, such as the United

States.  S. Res. 98, 105th Cong. (1997) (resolving by vote of 95-0 to urge the President not to sign any agreement that would result in serious harm to the economy or that did not include provisions regarding the emissions of developing nations).  Thereafter, Congress enacted a series of bills that affirmatively barred EPA from implementing the Protocol.  *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114 Stat. 1141, 1441A-41 (2000).  President George W. Bush also opposes the Protocol because it exempts developing nations.  *See* Transcript, *President Bush Discusses Global Climate Change* (Jun. 11, 2001), *available at* http://www.whitehouse.gov/news/releases/2001/06/20010611-2.html.  Instead, the policy of the current administration "emphasizes international cooperation and promotes working with other nations to develop an efficient and coordinated response to global climate change," which EPA describes as a "prudent," "realistic and effective long-term approach to the global climate change issue."  68 Fed. Reg. at 52933.

      **2.**      **The Relief Plaintiffs Seek Through This Suit.**  Apparently unhappy with the results of the political process, plaintiffs have sued five electric utilities, including a federal agency, that own and operate fossil fuel-burning power plants in the southeastern and midwestern portions of the country, seeking a judicially mandated reduction in the carbon dioxide emissions from these plants.  According to the complaints, defendants "are the five largest emitters of carbon dioxide in the United States," whose emissions "constitute approximately one quarter of the U.S. electric power sector's carbon dioxide emissions."  States Compl. ¶ 98; OSI Compl. ¶ 55.  Because, according to the complaints, U.S. electric power plants are responsible for "ten percent of worldwide carbon dioxide emissions from human activities," States Compl. ¶ 100; OSI Compl. ¶ 53, defendants are collectively responsible, on plaintiffs'

view of the facts, for 2.5% of worldwide carbon dioxide emissions from human activities (*i.e.*, 10% of 25%). Moreover, as plaintiffs acknowledge, carbon dioxide emissions from fossil fuel combustion do not account for all U.S. man-made greenhouse gas emissions, but rather approximately 80% of such emissions. States Compl. ¶ 99. Thus, according to plaintiffs, defendants necessarily contribute less than 2.5% of all man-made worldwide greenhouse gas emissions. Indeed, because emissions from human activities account for less than two-thirds of all greenhouse gases, *see* IPCC, *Climate Change 2001: The Scientific Basis* 6-7 (2001),[2] defendants' contribution to all greenhouse gases in the atmosphere is substantially smaller still.

Based on defendants' alleged contribution of less than 2.5% to all worldwide man-made greenhouse gas emissions, plaintiffs "seek an order (i) holding each of the defendants jointly and severally liable for contributing to an ongoing public nuisance, global warming, and (ii) enjoining each of the defendants to abate its contribution to the nuisance by capping its emissions of carbon dioxide and then reducing those emissions by a specified percentage each year for at least a decade." States Compl. ¶ 6; *see also id.*, Prayer for Relief ¶¶ a & b; OSI Compl. ¶ 10; *id.*, Prayer for Relief ¶¶ A & B. Plaintiffs do not state what "specified percentage" reduction they would have this Court impose, or what factors are to guide the Court in setting that percentage.

According to plaintiffs, these unspecified reductions in defendants' carbon dioxide emissions "*will contribute to a reduction in the risk and threat of injury* to the plaintiffs and their citizens and residents from global warming." States Compl. ¶ 148 (emphasis added); *see also*

---

[2] This document is incorporated by reference in the complaints. *See, e.g.*, States Compl. ¶¶ 80,88, 92-93; OSI Compl. ¶¶ 45, 50, 58.

OSI Compl. ¶ 90. Plaintiffs allege that, "by reducing emissions by approximately three percent annually over the next decade, the defendants would achieve *their share of the carbon dioxide emissions reductions necessary to significantly slow the rate and magnitude of warming*." States Compl. ¶ 148 (emphasis added); *see also* OSI Compl. ¶¶ 89-90. Plaintiffs further allege that delay in achieving these reductions "*may* lead to defendants' building or refurbishing generating facilities without inclusion or consideration of carbon dioxide reduction technologies." States Compl. ¶ 151 (emphasis added).

As defendants explain in detail below, the complaints should be dismissed as a matter of law because this Court lacks subject matter jurisdiction to consider them and they fail to state any claim upon which relief may be granted.

## ARGUMENT

In ruling on a 12(b)(1) motion, the Court must determine whether it has jurisdiction to hear the matter. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it"). Under Rule 12(b)(6), the Court determines whether the complaint is legally sufficient. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Under both rules, this Court must accept the allegations of the complaints as true and construe all reasonable inferences in favor of the plaintiffs. *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000); *Desiderio v. National Ass'n of Secs. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999); *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). At the same time, "'[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Smith v. Local 819 I.B.T.*

*Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (quoting *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000)). In addition, a "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). In a 12(b)(1) motion, "a district court . . . may refer to evidence outside the pleadings." *Id.* Similarly, when considering a 12(b)(6) motion, the Court may consider, in addition to the facts alleged in the complaints, any "documents attached as exhibits or incorporated by reference in the [complaints] and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993); *see also Tarshis*, 211 F.3d at 39. As defendants have previously explained, formal pronouncements by Executive Branch agencies and officials, federal laws and resolutions, and proposed federal legislation are all proper subjects of judicial notice. *See, supra*, n. 1. Application of the foregoing principles mandates dismissal of the extraordinary complaints plaintiffs have filed in this case.

## I.   THIS COURT LACKS JURISDICTION OVER THE COMPLAINTS WHICH FAIL TO STATE ANY CLAIM UNDER FEDERAL LAW.

This Court lacks jurisdiction over the complaints for two independently dispositive reasons. First, because there is no federal common law cause of action to redress global warming and no basis for creating one, plaintiffs have failed to state any claim for relief under federal law. In the unusual circumstances of this case, plaintiffs' failure to allege a valid federal cause of action deprives this Court of subject matter jurisdiction: there is no federal law under which plaintiffs' claims can "arise" for purposes of the "federal question" statute, 28 U.S.C. § 1331. Second, plaintiffs lack standing to sue for global warming. They have failed to allege that any of the risks of future harms they recite is sufficiently imminent to create a case or controversy in this Court. Nor have they alleged that defendants' actions are the cause of the

asserted risks of future injuries giving rise to their claims, and that the relief they seek will redress those injuries. Even if the Court were to conclude that plaintiffs do have Article III standing, their failure to allege any valid federal claims within the jurisdiction of this Court precludes the exercise of supplemental jurisdiction over plaintiffs' state law claims.

### A. Because There Is No Federal Common Law Cause Of Action To Sue For Global Warming, The Complaints Fail To State Any Claim For Relief.

Plaintiffs seeking relief in federal court must establish both that their "legal rights have been invaded" and that "a cause of action is available," *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 595 (1983). *See also Bell v. Hood*, 327 U.S. 678, 684 (1946) (plaintiffs must establish that they have "a general right to sue for such invasion"); *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (a "cause of action" entitles a litigant to "invoke the power of the court" in order "to enforce the right at issue"); *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002) (affirming 12(b)(6) dismissal because no private right of action existed). Because Congress has not created a cause of action authorizing plaintiffs to seek redress for global warming, plaintiffs ask this Court to recognize such a right under federal common law. States Compl. ¶¶ 1, 6, 35; 152-64; OSI Compl. ¶¶ 1, 10, 29, 91-103. This Court should emphatically deny that request.

Separation-of-powers principles preclude recognition of a federal common law cause of action for global warming. Those principles, which always counsel against lawmaking by federal courts, are especially compelling here. As defendants explain below, any response to global warming raises a host of complex, interrelated issues that affect the entire Nation and its relations with other countries. Under our system of government, these complex issues must be addressed by the Nation's democratically accountable political branches, not by litigants who seek to supplant the democratic process. Any suggestion that the Supreme Court has already

recognized a federal common law cause of action to redress global warming—and thus already authorized federal courts to make the numerous policy choices necessary to fashion relief in such suits—is baseless.

1. **Separation-of-powers principles preclude recognition of a federal common law cause of action to redress global warming.**

Prior to its landmark decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the Supreme Court had developed a body of federal common law to govern interstate environmental nuisance claims brought by States, *see, e.g., New York v. New Jersey*, 256 U.S. 296 (1921); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907). In *Erie*, however, the Court ruled that "[t]here is no federal general common law," 304 U.S. at 78, thereby sweeping away the foundation upon which that body of law rested. Since then, the Supreme Court has repeatedly held that federal courts can formulate federal common law only in "limited" areas that are notably "few and restricted." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (internal quotation marks omitted); *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (same). Reaffirming the separation-of-powers principles that underlie *Erie*, the Court has in recent years made clear that federal courts may not recognize federal common law rights and remedies where, as here, doing so requires courts to make far-reaching policy judgments that should be made by the politically accountable branches of government.

In *Texas Industries*, for example, the Court ruled that federal courts lack authority to create a federal common law right to contribution in antitrust actions. 451 U.S. 646-47. Noting that recognition of a such a right raised "far-reaching" policy questions affecting the "entire spectrum of antitrust law, not simply the elements of a particular case or category of cases," the Court concluded that:

"[t]he choice we are urged to make is a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot. That process involves the balancing of competing values and interests, which in our democratic system is the business of elected representatives. Whatever their validity, the contentions now pressed on us should be addressed to the political branches of the Government, the Congress and the Executive, and not to the courts."

451 U.S. at 647 (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 317 (1980)).

More recently, the Court relied on these same principles to reject creation of federal common law tort standards for professionals who advise federally insured financial institutions. *See O'Melveny & Myers*, 512 U.S. at 89. The Court explained that determining such standards "'"involves a host of considerations that must be weighed and appraised."' . . . . Within the federal system, at least, we have decided that that function of weighing and appraising "'is more appropriately for those who write the laws, rather than for those who interpret them."'" *Id.* (quoting *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 98 n.41 (1981)). This past summer, the Court declined to recognize a federal common law cause of action for violations of customary international law even though Congress had authorized such a judicial exercise of lawmaking power in the Alien Tort Statute. "[A] decision to create a private right of action," the Court emphasized, "is one better left to legislative judgment in the great majority of cases." *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2762-63 (2004).

These separation-of-powers principles apply with even greater force here, where plaintiffs ask this Court to recognize a federal common law cause of action to redress the risks of a phenomenon with sweeping national and international implications. As the Supreme Court has recognized, reducing air emissions "always" entails striking a balance "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the

13

economic concern that strict schemes [will] retard industrial development with attendant social costs." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 847 (1984). Requiring emission reductions by defendants' fossil fuel-fired plants will have significant economic effects. Indeed, in denying a recent petition urging it to regulate carbon dioxide emissions from automobiles, EPA observed that "[i]t is hard to imagine any issue in the environmental area having greater 'economic and political significance' than regulation of activities that might lead to global climate change." 68 Fed. Reg. at 52928; *see also* Memorandum from Robert E. Fabricant, EPA Gen. Counsel, to Marianne L. Horinko, Acting Administrator 9 (Aug. 28, 2003) ("To the extent significant reductions in U.S. [carbon dioxide] emissions were mandated . . . , power generation . . . would have to undergo widespread and wholesale transformations, affecting every sector of the nation's economy and threatening its overall economic health."). There can be no doubt that "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.'" *Chevron*, 467 U.S. at 866 (quoting *TVA v. Hill*, 437 U.S. 153, 195 (1978)).

Moreover, the relief plaintiffs seek—that this Court cap carbon dioxide emissions and then mandate annual reductions of an as-yet unspecified percentage, States Compl., Prayer for Relief ¶ b; OSI Compl., Prayer for Relief ¶ B—is intended to, and could, affect the mix of energy sources defendants use, and whether they continue to operate fossil fuel-fired plants or instead are forced to build other types of plants that do not emit carbon dioxide. Decisions on such matters, in turn, can affect the Nation's security. "U.S. national energy security depends on sufficient energy supplies to support U.S. and global economic growth," and "[o]ne aspect of the present [energy] crisis is an increased dependence, not only on foreign oil, but on a narrow range

of energy options." Nat'l Energy Policy Dev. Group, *National Energy Policy Report* 8-1, xiii (May 2001). This report recommended that, in order to "increase and diversify our nation's sources [of energy and] to enhance national security," *id*. at. xiv, the nation should *increase* its use of coal: "[T]he U.S. has enough coal to last for another 250 years." *Id.* at xiii. Whether the country should burn more coal, as the Presidential task force recommends, or limit its use, as plaintiffs seek, is a "far-reaching" "'matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot.'" *Texas Indus.*, 451 U.S. at 646-47; *see also New York v. FERC*, 535 U.S. 1, 24 (2002) (arguments regarding energy policy "are properly addressed to the [FERC] or to the Congress, not to [the Supreme] Court."); *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (decisions affecting national security are "a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion").

Global warming is also an issue of international concern and, as such, implicates the exclusive foreign policy province of the federal political branches. Because carbon dioxide "is emitted globally and has relatively homogenous concentrations around the world," it is impossible to reduce the level of carbon dioxide in the United States to a particular level "until such a standard [is] attained by the entire world as a result of emission controls implemented in countries around the world." 68 Fed. Reg. at 52927. Global warming, therefore, is an international problem that must be confronted through coordinated international action. *See* 15 U.S.C. § 2901(5) ("[i]nternational cooperation for the purpose of sharing the benefits and costs of a global effort to understand climate is essential").

The political branches have endeavored to achieve such an international solution. Beginning with Congress's 1987 directive to the Secretary of State to coordinate U.S. negotiations concerning global climate change, *see* 15 U.S.C. § 2901 note; *see also id.* § 2952(a) (directing the President and Secretary of State in 1990 to "initiate discussions" with other nations for agreements on climate research), the political branches have participated in the formation and approval of the UNFCCC, which brought together an international coalition to work toward a coordinated approach to global warming. *See* UNFCCC Homepage, *supra*, and the negotiation of the Kyoto Protocol, which called for mandatory reductions in the greenhouse gas emissions of developed nations, *see Kyoto Protocol*, *supra*. Since then, both the Senate and the full Congress have asserted the view that the Kyoto Protocol is, among other things, not sufficiently broad-based because it fails to require developing countries to shoulder part of the burden of reducing greenhouse gas emissions. *See* S. Res. 98 (urging the President not to sign an agreement that would seriously harm the economy or that did not include provisions regarding the emissions of developing nations); *see* Pub. L. No. 105-276, 112 Stat. at 2496 (1998) (barring EPA implementation of the Protocol); Pub. L. No. 106-74, 113 Stat. at 1080 (1999) (same); Pub. L. No. 106-377, 114 Stat. at 1141A-41 (2000) (same). President Bush has opposed the Protocol on this ground as well, *President Bush Discusses Global Climate Change*, *supra*, and the Executive Branch is instead pursuing a more "coordinated response to global climate change." 68 Fed. Reg. at 52933.

Because the political branches are actively engaged in international negotiations concerning the proper response to the asserted risks of global warming, this diplomatic issue is not a matter that this Court should seek to resolve on the urging of litigants unhappy with the pace or results of international coordination. "The conduct of the foreign relations of our

government is committed by the Constitution to the executive and legislative—'the political'—departments." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918); *see also American Ins. Ass'n v. Garamendi*, 123 S. Ct. 2374, 2386 (2003).  Indeed, even when Congress has authorized courts to recognize federal common law causes of action, "the potential implications for the foreign relations of the United States of recognizing such causes [of action] should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa*, 124 S. Ct. at 2763.  Here, recognition of the federal common law cause of action plaintiffs seek to assert will impinge directly and adversely on the management of foreign affairs by the political branches.  When it recently denied a petition to regulate carbon dioxide emissions from motor vehicles, EPA noted that "unilateral" regulation of carbon dioxide emissions in the United States could frustrate "U.S. efforts to persuade key developing countries to reduce the [greenhouse gas] intensity of their economies."  68 Fed. Reg. at 52931.  Moreover, "[a]ny potential benefit of EPA regulation could be lost to the extent other nations decided to let their emissions significantly increase in view of U.S. emission reductions." *Id*.  The relief plaintiffs seek in this suit could have the same negative effects on U.S. foreign policy.

In short, separation-of-powers principles preclude the courts from using their "limited" and "restricted" federal common law-making powers to recognize a cause of action that implicates a breath-taking array of policy issues that, in a democratic system, can only be resolved by those "directly responsible to the people whose welfare they advance or imperil." *Waterman S.S. Corp.*, 333 U.S. at 111.

### 2. The courts have not already recognized a federal common law cause of action for global warming.

There is no basis for arguing, as plaintiffs presumably will, that the Supreme Court has *already* created a federal common law cause of action that authorizes the sweeping judicial policy-making plaintiffs ask this Court to undertake. In the more than 65 years since *Erie*, the Supreme Court has created a federal common law cause of action for an interstate nuisance only once; in *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*"), it recognized such an action for interstate water pollution, a traditional nuisance that the common law had long regulated. Even assuming that *Milwaukee I* is still good law—and there are compelling reasons to doubt that it is—it plainly does not authorize federal common law causes of action to abate global warming, a type of "nuisance" unheard of in the common law and one that neither federal nor state courts have ever regulated. The separation-of-powers principles discussed above preclude any extension of *Milwaukee I* to permit prosecution of the claims plaintiffs assert here.

In *Milwaukee I*, the Court created a federal common law cause of action for "pollution of interstate or navigable waters." *Id.* at 99. In discussing the remedies available in such an action, the Court stated in dicta that federal courts could fashion federal rules of decision to abate both interstate air and water pollution. *See id.* at 103.[3] Nine years later, the Court held that subsequent changes in federal law displaced the cause of action *Milwaukee I* had created for

---

[3] In its discussion of remedies, the Court observed that federal common law applied in cases involving "air and water in their ambient or interstate aspects," *Milwaukee I*, 406 U.S. at 103. This observation was immediately followed by a statement that federal statutes "may provide useful guidelines in fashioning such *rules of decision.*" *Id.* at 103 n.5 (emphasis added). Thus, even in its dicta concerning air pollution, *Milwaukee I* did not state that there was a federal common law *cause of action* to abate such pollution, and instead referred to the legally distinct concept of federal common law rules of decision. *See, e.g.*, *O'Melveny & Myers*, 512 U.S. at 87-88 (distinguishing between "a federal rule of decision" and a state-law tort cause of action against professionals who advised federally insured financial institutions).

water pollution.  *City of Milwaukee v. Illinois*, 451 U.S. 304, 332 (1981) ("*Milwaukee II*").  In the 32 years since *Milwaukee I* was decided, the Court has never recognized a federal common law cause of action for any other form of pollution, and has instead repudiated the premises upon which that decision rested.

In the intervening years, the Court has repeatedly held that courts should not recognize federal causes of action without congressional authorization, *see, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("private rights of action to enforce federal law must be created by Congress"), and has held that, even when Congress authorizes judicial creation of a federal common law cause of action, courts should do so rarely.  *See Sosa*, 124 S. Ct. at 2762-63.  Similarly, the Court no longer espouses *Milwaukee I*'s view that it "'is not uncommon for federal courts to fashion federal law where federal rights are concerned.'"  406 U.S. at 103.  *See O'Melveny & Myers*, 512 U.S. at 88 (creation of federal law is proper only in a few, limited areas).  And, in *Milwaukee II*, the Court disparaged the use of "often vague and indeterminate nuisance concepts and maxims of equity jurisprudence" to formulate federal common law water pollution standards, 451 U.S. at 317—the very approach *Milwaukee I* endorsed.  *See* 406 U.S. at 107.

But even if *Milwaukee I* has not been implicitly overruled, neither its holding nor its dicta applies to the unprecedented "nuisance" claim plaintiffs assert.  In *Milwaukee I*, the Court explained that "'[i]t is the creation of a public nuisance *of simple type* for which a State may properly ask an injunction'" against another State.  406 U.S. at 106 n.8 (emphasis added) (quoting *North Dakota v. Minnesota*, 263 U.S. 365, 374 (1923)), and it noted that "'the discharge of sewage or *poisonous gases*,'" even when done by a municipality, had long been regulated by the common law.  *Id.* at 108 n.10 (emphasis added; quoting 17 E. McQuillen, *The Law of*

*Municipal Corporations* § 49.55 (3d rev. ed. 1968)); *see also id.* at 104 (describing the "leading air case" of *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907), as one involving "noxious gases").  These "simple type[s]" of traditional common law nuisances did not raise the national and foreign policy issues that today preclude federal courts from fashioning federal common law to address claims regarding global warming.

There is nothing "simple" about plaintiffs' unprecedented "global nuisance" claim, in which, for example, California is asking a New York Court to control the operations of power plants in 20 down-wind States in the Midwest and South in order to address a concededly international phenomenon.  Unlike the "sulphurous acid gas" at issue in *Tennessee Copper Co.*, 206 U.S. at 238, carbon dioxide is not a "poisonous" or "noxious" gas.  In fact, the political branches have declined to regulate carbon dioxide as an air pollutant.  *See* 68 Fed. Reg. at 52928-29.  Nor has the common law regulated emissions of carbon dioxide.  The emission of such gas, moreover, does not, in and of itself, cause a particularized and identifiable harm the way plumes of noxious gases do.  Rather, as EPA has explained, carbon dioxide "is emitted globally and has relatively homogenous concentrations around the world," and it is "extremely difficult to evaluate the extent over time to which *effects in the U.S.* would be related to anthropogenic *emissions in the U.S.*"  *Id.* at 52927 (emphases added).

These characteristics of carbon dioxide emissions—their numerous and ubiquitous sources and their collective agency in contributing to the risks of a global phenomenon—make clear that global warming is not a "public nuisance of simple type," *Milwaukee I*, 406 U.S. at 106 n.8 (internal quotation marks omitted), and that regulation of such emissions is instead "'a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot.'"  *Texas Indus.*,

451 U.S. at 647. These characteristics require policymakers to decide which of many domestic sources, if any, to regulate, and to assess the many economic and environmental trade-offs associated with such choices. Similarly, the global nature of the phenomenon requires those policymakers to decide how to negotiate and coordinate efforts with other nations on the issue. Even if *Milwaukee I* survives as good law, that decision's recognition of a federal common law cause of action for "simple" and well-established water pollution nuisances (and its dicta referring to federal rules of decisions for cases involving similar air pollution nuisances) cannot possibly be understood to have authorized federal district courts to make such complex and sweeping policy decisions.

In sum, there is no established federal common law cause of action to enjoin carbon dioxide emissions in order to abate the new and unique risks of global warming alleged by plaintiffs in these suits. The rationale of *Milwaukee I* cannot be extended to recognize a cause of action for global warming without impermissibly usurping the roles of the political branches in violation of separation-of-powers principles.

**3. Congress has displaced any federal common law cause of action that might otherwise be available to address global climate change.**

Even assuming, for the sake of argument, that (1) there was a federal common law nuisance cause of action that plaintiffs could otherwise invoke, or (2) this Court could otherwise properly create such a right for them, any conceivable authority federal courts might have had to address global warming using federal common law has been displaced. As the Second Circuit has recognized, the Clean Air Act ("CAA") establishes a comprehensive federal scheme for regulating air emissions. Both in the context of that comprehensive scheme, and in a number of other statutes, Congress has repeatedly and deliberately declined to enact or authorize limits on

carbon dioxide emissions, and has instead mandated additional research and information gathering concerning such emissions and global warming. Because Congress has, through these laws, spoken directly to the issue of global climate change, there is no basis for recognizing any federal common law cause of action to address global warming.

The standard for determining when Congress has displaced federal common law is different from—and far less demanding than—the standards that govern preemption of state law. Because "it is for Congress, not federal courts to articulate the appropriate standards to be applied as a matter of federal law," courts should approach the question of displacement with a "willingness to find congressional displacement of federal common law." *Milwaukee II*, 451 U.S. at 317 & n.9 (emphasis deleted). As long as "the scheme established by Congress addresses the problem formerly governed by federal common law," *id.* at 315 n.8—*i.e.*, if Congress has "spoken to [the] particular issue," *id.* at 313—federal common law is displaced. *See also United States v. Oswego Barge Corp. (In re Oswego Barge Corp.)*, 664 F.2d 327, 335 (2d Cir. 1981) (federal common law displaced "as to every question to which the legislative scheme 'spoke directly,' and every problem that Congress has 'addressed'. . . . [and] separation of powers concerns create a presumption in favor of [displacement] of federal common law *whenever it can be said that Congress has legislated on the subject*") (emphasis added) (quoting *Milwaukee II*, 451 U.S. at 315). Congress need not create an alternative remedy to displace federal common law: "The lesson of *Milwaukee II* is that once Congress has addressed a national concern, our fundamental commitment to the separation of powers precludes the courts from scrutinizing the sufficiency of the congressional solution" or "holding that the solution Congress chose is not adequate." *Illinois v. Outboard Marine Corp.*, 680 F.2d 473, 478 (7th Cir. 1982). There can be no doubt that Congress has "addressed" and "spoken to" the issue of global climate change.

Like the federal regulatory scheme that displaced *Milwaukee I*'s federal common law cause of action for water pollution, the CAA embodies a "comprehensive legislative scheme," *Weiler v. Chatham Forest Prods., Inc.*, 370 F.3d 339, 341 (2d Cir. 2004), involving "the technically complex area of environmental law . . . where Congress has vested administrative authority in a federal agency presumably having significant technical expertise." *New England Legal Found. v. Costle*, 666 F.2d 30, 33 (2d Cir. 1981) (per curiam); *see also id.* at 32 n.2 (noting that "there are similarities between the [CWA], which was the subject of *City of Milwaukee [II]*, and the [CAA]"). The CAA imposes numerous detailed requirements on the operation of defendants' power plants. *See, e.g.*, 42 U.S.C. §§ 7411 (requiring the establishment of New Source Performance Standards); *id.* §§ 7651-7651o (establishing a program to control emissions of sulfur dioxide and nitrogen oxides from electric utilities); *id.* §§ 7661-7661f (establishing operating permit program).

When Congress in 1990 last enacted major amendments to this comprehensive scheme, it expressly chose to study the possible effects of carbon dioxide emissions on global climate, but *not* to authorize regulation of those emissions. Section 103(g) of the CAA directs EPA to establish a "basic engineering research and technology program to develop, evaluate, and demonstrate nonregulatory strategies and technologies for air pollution prevention" that would address several substances, including carbon dioxide. 42 U.S.C. § 7403(g). Section 821 of the 1990 CAA Amendments required electric utilities, including defendants, to monitor and report annually "carbon dioxide emissions." Pub. L. No. 101-549, § 821(a), 104 Stat. 2399, 2699 (1990).[4] At the same time, however, Congress expressly stated that the new provisions were not

---

[4] Section 602(e) of the CAA also directs EPA to publish "the global warming potential of each listed substance" set forth in section 602 or added thereafter. 42 U.S.C. § 7671a(e). Although

to be construed as authorizing imposition of any emissions limits. *See* 42 U.S.C. § 7671a(e) (directive to publish global warming potential of substances "shall not be construed to be the basis of any additional regulation under this chapter"); 42 U.S.C. § 7403(g) ("[n]othing" in new subsection 103(g) "shall be construed to authorize the imposition on any person of air pollution control requirements"); *see also* House Debate (May 23, 1990), *in* 2 Comm. on Env't & Pub. Works, 103d Cong., *A Legislative History of the Clean Air Act Amendments of 1990*, at 2776-78 (Comm. Print 1993) (making clear that Congress's purpose in enacting section 103(g) was to update EPA's "science mandate" to include research that would help provide a basis for future decisions *by Congress* on global climate change issues).[5]

Both before and since the 1990 amendments to the CAA, moreover, Congress has addressed global climate change and carbon dioxide in a number of other statutes and resolutions, all of which are fully consistent with the cautious, measured approach set forth in the 1990 amendments. In no fewer than five of these laws, Congress established programs or directed federal agencies to research and study global climate change and the impact of carbon

carbon dioxide is not one of the listed substances, this provision also illustrates Congress's objective of obtaining information regarding global climate change.

[5] Indeed, in denying a rulemaking petition to regulate carbon dioxide and other greenhouse gas emissions from motor vehicles, EPA found that, "[b]ased on a thorough review of the CAA, its legislative history, [and] other congressional action," no authority exists under the CAA to limit or regulate carbon dioxide emissions for global climate change purposes. 68 Fed. Reg. at 52925. Seven of the governmental plaintiffs in this case are challenging EPA's denial of the rulemaking petition, claiming that the CAA does authorize EPA regulation of such emissions. *Massachusetts v. EPA*, No. 03-1361 (and consolidated cases) (D.C. Cir. Oct. 23, 2003). In their view, therefore, Congress has necessarily displaced federal common law by authorizing regulation of carbon dioxide emissions under the CAA. Even if the D.C. Circuit rejects their claim, however, such an authorization is not necessary to a finding of displacement here, where Congress has enacted a comprehensive regulatory scheme and has spoken to the particular issue—both in the context of that scheme and in related laws—by restricting action on global climate change to information-gathering activities and study and research programs.

dioxide emissions. *See* National Climate Program Act of 1978, 15 U.S.C. §§ 2901 *et seq.*

(establishing "national climate program" to improve understanding of global warming through

research, data collection, assessments, and international cooperation); Energy Security Act, Pub.

L. No. 96-294, tit. VII, § 711, 94 Stat. at 774 (authorizing National Academy of Sciences study

of the "projected impact, on the level of carbon dioxide in the atmosphere," of various energy

production activities); Global Change Research Act of 1990, 15 U.S.C. §§ 2931-2938

(establishing 10-year research program for global climate issues, including periodic scientific

assessments to "analyze[] current trends in global change"); Pub. L. No. 101-624, § 2402, 104

Stat. at 4058-59 (establishing research program for agricultural issues related to global climate

change); Energy Policy Act, Pub. L. No. 102-486, § 1604, 106 Stat. at 3002 (directing Secretary

of Energy to conduct assessments related to greenhouse gases). In the Global Climate Protection

Act of 1987, Congress directed the Secretary of State to coordinate U.S. negotiations concerning

global climate change. *See* 15 U.S.C. § 2901 note; *see also id.* § 2952(a) (directing the President

and Secretary of State in 1990 to "initiate discussions" with other nations for agreements on

climate research). In 1997, the Senate unanimously passed a resolution expressing its

disapproval of the Kyoto Protocol, which mandated reductions in greenhouse gas emissions by

developed nations alone, and in subsequent years Congress as a whole passed a series of annual

appropriation riders prohibiting domestic implementation of the Protocol. *See supra* at 6-7.[6]

As these actions demonstrate, Congress has indisputably "spoken to [the] particular

issue" of global climate change and the impact of carbon dioxide emissions, *Milwaukee II*, 451

U.S. at 313, and has repeatedly "legislated on the subject," *Oswego Barge*, 664 F.2d at 335—

---

[6] Congress has also repeatedly declined to adopt bills calling for the regulation of domestic
greenhouse gas emissions. *See, e.g.*, S. 1224, 101st Cong. (1989); H.R. 5966, 101st Cong.

both as part of its comprehensive regulation of domestic air quality in the CAA and in its enactment of other statutes calling for study, research, and international negotiations concerning global warming.  In every instance, Congress has addressed the issue by deciding *not* to regulate or limit carbon dioxide emissions at this time, and to study the matter further while additional research and international negotiations are undertaken.  No federal court has authority to second-guess Congress's approach to this complicated and multifaceted national and international policy issue.

Yet, that is precisely what plaintiffs seek to do under the guise of a federal common law nuisance action.  Indeed, while Congress has expressly directed EPA to study and evaluate the feasibility of carbon dioxide-reducing technologies, 42 U.S.C. § 7403(g), has repeatedly declined to impose carbon dioxide emission limits to address global climate change, and has denied to an expert administrative agency authority to impose such limits, plaintiffs ask this Court to "cap" such emissions immediately, and to mandate specified percentage reductions of those emissions for at least ten years.  The Supreme Court has made clear that the federal judiciary's "'commitment to the separation of powers is too fundamental' . . . to rely on federal common law 'by judicially decreeing what accords with "common sense and the public weal"'" when Congress has addressed the problem."  *Milwaukee II*, 451 U.S. at 315 (quoting *TVA v. Hill*, 437 U.S. at 195).  It follows *a fortiori* that plaintiffs cannot use federal common law to flout Congress's considered judgment concerning the proper response to the issue of global warming.

In short, because there is no basis for recognizing a federal common law nuisance action to abate global warming, plaintiffs have failed to state any federal claim for relief.

---

(1990); H.R. 2663, 102d Cong. (1991).

## B. Because Plaintiffs Have Failed To State A Federal Claim For Relief, This Court Lacks Subject Matter Jurisdiction.

Although a failure to state a claim for relief does not ordinarily implicate a federal court's subject matter jurisdiction, in this case it does. Plaintiffs relied on their "federal common law" claims as the basis for pleading jurisdiction over claims "arising under" the laws of the United States. 28 U.S.C. § 1331. Because "[a] suit arises under the law that creates the cause of action," *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916), to establish that this Court has subject matter jurisdiction plaintiffs here must show that federal law creates the cause of action they assert. *See Milwaukee I*, 406 U.S. at 99 (concluding that the federal common law cause of action created for water pollution arose "under the 'laws' of the United States within the meaning of § 1331(a)"). As defendants have shown, however, there is no federal common law cause of action to abate global warming. Where, as here, federal law does not create a cause of action at all, a suit cannot "arise" under federal law within the meaning of § 1331. *Cf. Members for a Better Union v. Bevona*, 152 F.3d 58, 62 (2d Cir. 1998) (where federal statute made a valid claim for relief a predicate to federal jurisdiction, failure to state a claim amounted to a jurisdictional defect).

Although plaintiffs' failure to state any claim under federal common law deprives this Court of subject matter jurisdiction with respect to plaintiffs' claims against the private defendants, that defect alone does not implicate this Court's jurisdiction over TVA. It is settled that federal courts have jurisdiction under both § 1331 and § 1337 over state law tort actions against TVA. *Jackson v. TVA*, 462 F. Supp. 45, 50-51 (M.D. Tenn. 1978) (citing cases).[7]

---

[7] As TVA explains in its separate memorandum of law, plaintiffs' claims against it are barred by the discretionary function doctrine. *See* Memorandum of Law in Support of Tennessee Valley Authority's Motions to Dismiss on Federal Discretionary Function Grounds.

Nevertheless, this Court lacks subject matter jurisdiction over plaintiffs' claims against TVA—and the other defendants—for an additional reason. As defendants explain next, plaintiffs lack standing to pursue the any of the claims they assert in this case.

## C. Plaintiffs Have Failed To Allege Facts Sufficient To Establish Article III Standing.

The complaints should likewise be dismissed because plaintiffs fail to establish the fundamental prerequisite for all federal litigation—that they have standing to bring the suit. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). To demonstrate standing, plaintiffs must meet each of three "minimum" requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (plurality opinion) (internal citations and footnotes omitted). Plaintiffs bear the burden of establishing each of these three factors, *id.* at 561, and they fall short on all three counts.

### 1. Plaintiffs allege no actionable injury-in-fact.

Although plaintiffs' complaints are replete with claims about the adverse consequences of global warming, they fail to identify a single actionable injury. As an initial matter, plaintiffs claim no *current* injury. Although they assert that global warming "has begun," *e.g.*, States Compl. ¶¶ 1, 79, 103; OSI Compl. ¶ 2, 44, global warming is a phenomenon, not an injury.

When plaintiffs point to particular alleged injuries, they cannot identify any that has already

occurred, or that is currently occurring;[8] instead, they allege only that those injuries will occur at

some point in the indefinite future. Thus, the complaints speak, over and over again, about what

global warming "will" do,[9] "could" do,[10] "is expected" to do,[11] "threatens" to do,[12] or increases

the risks of occurring.[13] In short, the *only* injury alleged by plaintiffs is that global warming

creates a risk of future harm over the course of the next century. *See, e.g.*, States Compl. ¶¶ 95-

96, 107; OSI Compl. ¶¶ 61, 63.

The risk of future harm can form the basis for Article III standing only under limited

circumstances: "Where there is no actual harm . . . , its imminence . . . must be established."

*Lujan*, 504 U.S. at 565 n.2; *see also id.* at 560-61 (harm cannot be "conjectural" or

"hypothetical") (internal quotation marks omitted); *City of Los Angeles v. Lyons*, 461 U.S. 95,

102 (1983) ("the injury or threat of injury must be both 'real and immediate'"). Accordingly, the

Supreme Court and the Second Circuit have reiterated that there must be a close temporal

proximity between the complained-of conduct and the alleged future harm. *See Whitmore v.

Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the

requirements of Art. III. A threatened injury must be "'"certainly impending"'"" to constitute

injury in fact."); *id.* at 155 ("'injury in fact' . . . . must be concrete in both a qualitative and

---

[8] Plaintiffs' inability to cite any past or current injury is particularly telling in light of their contention that global temperature increases over the past 50 years are attributable to greenhouse gases. States Compl. ¶¶ 80-81.
[9] *E.g.*, States Compl. ¶¶ 94, 95, 107, 108, 111, 113, 114, 115, 117, 118, 119, 120, 124, 126, 127, 130, 131, 132, 133, 135, 136, 138, 139, 141, 142; OSI Compl. ¶¶ 6-8, 58-59, 61, 63, 68, 75, 80-88.
[10] *E.g.*, States Compl. ¶¶ 110, 142.
[11] *E.g.*, *id.* ¶ 110.
[12] *E.g.*, *id.* ¶¶ 3, 116, 129, 133, 137.
[13] *E.g.*, *id.* ¶¶ 4, 120, 143, 144, 146; OSI Compl. ¶ 64.

temporal sense"); *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003) ("Given the potentially expansive and nebulous nature of enhanced risk claims, we agree that plaintiffs . . . must allege a 'credible threat of harm' to establish injury-in-fact based on exposure to enhanced risk.").

Under these standards, the Court rejected claims of "some day" injuries, and concluded that an injury that assertedly would occur "'in this lifetime'" was insufficient to meet the Article III requirement. *Lujan*, 504 U.S. at 564 n.2. Just this year, the Supreme Court reiterated that an injury must be "certainly impending" to satisfy Article III. In *McConnell v. FEC*, it rejected for lack of standing a challenge by Senator McConnell to section 307 of the Bipartisan Campaign Reform Act of 2002. Because that provision could not apply to him until 2008 at the earliest, the imminence requirement was not met. 124 S. Ct. 619, 707-08 (2003).

Here, plaintiffs utterly fail to satisfy the requirement of alleging future harms that are imminent, for they cannot and do not identify when any one of the asserted future harms will occur. Instead, they simply claim that the injuries "will" occur at some unspecified future date. *See supra* at notes 8-12 and accompanying text. The closest plaintiffs come to identifying a timeframe for the alleged harms is their contention that "[u]nrestrained emissions of greenhouse gases . . . will cause temperatures . . . to increase significantly *over the next 100 years*," States Compl. ¶ 106 (emphasis added); *see also* OSI Compl. ¶ 61, and that these projected temperature increases will cause the specified harms, States Compl. ¶¶ 107 *et seq.*; *see also* OSI Compl. ¶ 61 *et seq.* If the four-year delay in *McConnell* was insufficiently imminent to satisfy Article III, the century-long window identified by plaintiffs here is far too distant to meet the imminence requirement. Under closely analogous circumstances, the Eighth Circuit recently found no standing. In *Shain v. Veneman*, the plaintiffs alleged that defendants' conduct—building a sewage plant in a 100-year flood plain—increased the risk that harm would result from such a

flood. 376 F.3d 815, 818 (8th Cir. 2004). The court rejected the suit for lack of standing, on the reasoning that the alleged danger stemming from a 100-year flood was "remote." *Id.* at 818, 819. Here, as in *Shain*, plaintiffs have claimed that the injuries they identify will occur some time in the next century. Just as in *Shain*, these speculative, "some day" assertions, *Lujan,* 504 U.S. at 564 n.2, fail to clear the constitutional hurdle.[14]

## 2. Plaintiffs do not, and cannot, adequately allege causation.

Even if the injuries plaintiffs allege were in fact actionable, these cases would nonetheless have to be dismissed for lack of standing because plaintiffs have not alleged—and, indeed, could not credibly allege—that defendants' conduct caused the claimed injuries. *See id.* at 560-61.

To satisfy the causation requirement, the alleged injury must be "'fairly traceable' to the actions of the defendant." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). In the case of threatened, as opposed to current, injuries, plaintiffs must allege not only that the threat is imminent, *see supra* at 29, but also that the challenged conduct is "substantially likely" to cause "a demonstrable increase in an existing risk." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665, 669 (D.C. Cir. 1996); *accord Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001). Plaintiffs have made no such allegations.

---

[14] Although plaintiffs baldly assert that "[t]he injuries from global warming claimed herein are imminent," States Compl. ¶ 161; OSI Compl. ¶ 101, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (alteration and internal quotation marks omitted); *accord Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996 ) ("bald assertions and conclusions of law will not suffice"). This is particularly true where, as here, specific allegations *contradict* plaintiffs' conclusory claims of imminence. *See supra* at 30-31.

The complaints catalogue the amount of carbon dioxide defendants allegedly emit, States Compl. ¶ 2; OSI Compl. ¶ 3, and the future harms that global warming will allegedly cause, States Compl. ¶¶ 3, 103-146; OSI Compl. ¶¶ 57-88; they also assert that reducing carbon dioxide emissions will reduce the risk of global warming, States Compl. ¶¶ 147-151; OSI Compl.¶¶ 89-90. But at no point do plaintiffs allege that defendants' conduct directly caused, or will cause, the ills they identify as the consequences of global warming. That alone distinguishes this case from traditional pollution and nuisance cases, in which the conduct of the defendants itself directly causes, or threatens to cause, the plaintiffs' injury. *E.g., LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002). Nor do plaintiffs even make the subsidiary claim that defendants' emissions have caused or will cause global warming (or, conversely, that global warming would cease to occur in the absence of defendants' emissions). Nowhere do they assert that defendants' conduct has caused the alleged harms or materially increased the risk that the alleged harms will occur.

In fact, any such claim would be flatly inconsistent with the facts the plaintiffs do allege. First, according to plaintiffs themselves, defendants' emissions constitute less than *two and a half percent* of the global emissions of greenhouse gases from human activities. *See supra* at 7-8. Second, global warming, as plaintiffs further recognize, does not exist on a local scale as the result of local emissions; rather, carbon dioxide and other greenhouse gas emissions from all parts of the world "rapidly mix in the atmosphere and cause an increase in the atmospheric concentration of carbon dioxide *worldwide*." States Compl. ¶ 155 (emphasis added); OSI Compl. ¶ 97. On plaintiffs' own view of the facts, therefore, defendants' emissions are a very minor contributor to a problem that is global by its very nature. In no sense is it "substantially probable" that the carbon dioxide emissions of these five utilities, which, according to plaintiffs,

account for less than 2.5% of man-made global greenhouse gas emissions, *alone* cause a demonstrable increase in the risk of alleged injuries from global warming. *Florida Audubon Soc'y*, 94 F.3d at 663. Because plaintiffs do not satisfy Article III's causation requirement, their complaints must be dismissed.

### 3.  Plaintiffs do not, and cannot, adequately allege redressability.

To have standing under Article III, a plaintiff must also seek a remedy that, if granted, will redress the injury he alleges. "Redressability examines whether the relief sought . . . will likely alleviate the particularized injury alleged by the plaintiff." *Id.* at 663-64 (footnote omitted); *see also Allen v. Wright*, 468 U.S. 737, 751 (1984) ("relief from the injury must be 'likely' to follow from a favorable decision"); *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 628 n.6 (2d Cir. 1989) (there must be "a substantial likelihood that the relief requested will have a *substantial* ameliorative effect on the specific injury alleged") (emphasis added).

The relief plaintiffs seek would not redress the risks of future harms that they allege. As noted, plaintiffs ask this Court to cap defendants' emissions of carbon dioxide, then order defendants to reduce emissions by some unidentified percentage. *See* States Compl., Prayer for Relief ¶¶ a & b; OSI Compl., Prayer for Relief ¶¶ A & B. There is no "substantial likelihood" that such an injunction would actually remediate the risk of global warming, and, thereby, the risk of injuries that global warming will allegedly cause. *Fulani*, 888 F.2d at 628 n.6.

First, plaintiffs do not and cannot claim that eliminating *part* of defendants' 2.5% contribution to total man-made emissions of carbon dioxide would or could remediate global warming. Plaintiffs tacitly concede as much by claiming that this remedy would "achieve

[defendants'] *share* of the carbon dioxide emission reductions necessary to significantly slow the rate and magnitude of warming." States Compl. ¶ 148 (emphasis added). In other words, according to plaintiffs, the emission reductions plaintiffs seek through this suit are merely a "share," or part, of the overall reductions "necessary" to slow global warming and, presumably, to reduce the risk of future harms to plaintiffs. Plaintiffs themselves thus acknowledge that the alleged risk of future harms of global warming will *not* be forestalled, or redressed, by a partial reduction of defendants' emissions alone.

Plaintiffs lack standing to seek to eliminate only a minor contributing cause of an alleged harm. In *Lujan*, plaintiffs challenged agencies' failures to consider the impact on endangered species of the agencies' foreign funding decisions, claiming that those decisions threatened endangered species around the world. 504 U.S. at 558-59, 563. A plurality of the Supreme Court rejected this challenge, noting "that the agencies generally supply only a fraction of the funding" for a specified foreign project. [The Agency for International Development], for example, has provided less than 10% of the funding." *Id.* at 571. Thus, the plurality concluded, because there was no showing that the elimination of this partial contributing cause would redress the claimed injury, there was no standing. *Id.* If 10% was insufficient in *Lujan*, the 2.5% alleged here certainly must be inadequate as well.

The decision in *U.S. EPA ex rel. McKeown v. Port Authority*, 162 F. Supp. 2d 173, 184 (S.D.N.Y.), *aff'd*, 23 Fed. Appx. 81 (2d Cir. 2001), illustrates this same principle. The plaintiffs in that case claimed that the use of tollbooths in various states—including New York and New Jersey (defendants in that case, but plaintiffs here)—caused vehicles to idle, and therefore increased air pollution in violation of numerous federal statutes and federal common law. *Id.* at 180. Defendants argued, and the district court agreed, that the claimed injury was not

redressable, because the complained-of emissions are "caused by . . . millions of people not parties to this action," and that even if all toll booths were removed, the emissions would nonetheless occur. *Id.* at 184. New York's successful argument in that case is directly applicable here, and confirms that it, and the other plaintiffs in this case, lack standing because the relief they seek will not redress their alleged injuries.

Second, plaintiffs' claims are not redressable because "the injury to [plaintiffs] . . . 'results from the independent action of some third party not before the court.'" *Allen*, 468 U.S. at 757. As just noted, plaintiffs' allegations tacitly admit that the alleged harms of global warming can be redressed only if the relief they seek against defendants is combined with other reductions in carbon dioxide and other greenhouse gas emissions—by entities that are not named in the complaint, and that almost certainly could not be joined in this action because they are innumerable and scattered around the globe. Put simply, unless emissions by those other parties are enjoined as well, the relief plaintiffs request would not eliminate or redress the asserted consequences of global warming.[15]

---

[15] Indeed, for this reason, the complaints should also be dismissed for failure to join indispensable parties. *See* Fed. R. Civ. P. 19. Based on plaintiffs' allegations that "[t]he combustion of fossil fuels adds large quantities of carbon (in the form of carbon dioxide) to the atmosphere," which allegedly contribute to global climate change, States Compl. ¶ 87; OSI Compl. ¶ 51, many parties exist that burn fossil fuels, thereby contributing to plaintiffs' alleged injuries. In fact, plaintiffs admit that emissions from defendants' plants represent only a small fraction of anthropogenic carbon dioxide emissions within the United States and worldwide. States Compl. ¶¶ 98, 100; OSI Compl. ¶¶ 53, 55. Because the burning of fossil fuels is so prevalent in the world, almost anyone, anywhere could be considered to contribute to plaintiffs' alleged nuisance: (1) virtually every industrial facility worldwide; (2) every owner of a motor vehicle that burns gasoline or diesel fuel; and (3) every property owner that relies on the burning of fossil fuels (such as natural gas or heating oil) for heating. The list is virtually endless. In addition, defendants are exposed to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations," Fed. R. Civ. P. 19(a), because 42 States besides the plaintiff States, the federal government, foreign governments, municipalities, and private landowners, could all make

Under analogous circumstances, where effective relief depends on reaching the actions of third parties, courts have repeatedly recognized that there is no standing, for the simple reason that "the 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). On at least four separate occasions, the Supreme Court has held that there was no redressability where plaintiffs challenged government actions in an effort to effect changes in the actions of third parties not before the Court, because it was "entirely speculative" whether the requested relief—declaratory or injunctive relief against the government entity—would in fact result in the sought-after change. *Allen*, 468 U.S. at 757-59; *Simon*, 426 U.S. at 41-43; *Warth*, 422 U.S. at 504-07; *Linda R.S. v. Richard D.*, 410 U.S. 614, 618-19 (1973). Indeed, the lack of standing is far more fundamental here. In those cases, there was at least the prospect that the action of the court would affect the behavior of the third parties in a way that would lead to meaningful relief, "speculative" though that prospect may have been. Here, by contrast, there is *no* such prospect, as the relief that plaintiffs request would not under any set of circumstances reach the third parties that are responsible—again, on plaintiffs' own view of the facts—for over 97% of the global man-made emissions of carbon dioxide.

Third, the requested relief cannot remedy plaintiffs' alleged injury because defendants' asserted contribution to man-made global greenhouse gas emissions, even if abated, is so small that it will be more than replaced by other emissions within a short period of time for reasons

---

the same kinds of nuisance complaints against defendants that plaintiffs allege.

beyond the control of the defendants. The report of the Intergovernmental Panel on Climate Change ("IPCC"), upon which Plaintiffs repeatedly rely (*e.g.*, States Compl. ¶¶ 80, 88; OSI Compl. ¶¶ 58, 61), states that global carbon dioxide emissions have increased at a rate of 1.4% *per year* between 1990 and 1998. *See* Working Group III, IPCC, *Summary for Policymakers; Climate Change 2001: Mitigation* 7 (2001), *in* IPCC, *Climate Change 2001: Synthesis Report* (2001). Thus, even if defendants' emissions were decreased by 30% immediately (rather than over 10 years, as plaintiffs suggest), that 30% reduction in defendants' 2.5% contribution to worldwide man-made carbon dioxide emissions would be made up within about six months. For this reason, too, there is no possibility that "relief from the injury [is] 'likely' to follow from a favorable decision." *Allen*, 468 U.S. at 751.

Article III's redressability requirement enforces the same separation-of-powers limitations that preclude the creation of a federal common law cause of action to abate global warming. Article III's standing requirements are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 498 (1975); *see also Allen*, 468 U.S. at 752 ("the law of Art[icle] III standing is built on a single basic idea—the idea of separation of powers"). These requirements ensure that the courts are not "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions." *Warth*, 422 U.S. at 500. Even on plaintiffs' view of the facts, to achieve legally meaningful reductions in greenhouse gas emissions and to redress the alleged injuries caused by global warming, this Court would have to be able to regulate a wide range of domestic and international activities that cause such emissions, which it cannot do. This underscores the fact that the response to global

warming raises issues of "wide public significance" that "other governmental institutions"—*i.e.*, the political branches—are indisputably "more competent to address." *Id.*

In short, because the redressability requirement is not, and cannot be, satisfied, these cases should be dismissed for lack of standing.

**D.      There Is No Basis for Exercising Supplemental Jurisdiction.**

Because plaintiffs lack Article III standing, this Court is completely without jurisdiction, and thus cannot exercise supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' state law nuisance claims.  But even *if* plaintiffs could satisfy Article III's standing requirements, dismissal of the state law claims is still mandated.  As defendants have shown, this Court lacks original jurisdiction because plaintiffs' claims do not fall within either of the statutory grants of federal jurisdiction they cite.  In such circumstances, there is no basis for exercising supplemental jurisdiction.  *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996) ("the district court … cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction"); 16 *Moore's Federal Practice* § 106.66[1], at 106-88 (3d ed. 2004) ("[I]f the federal claim was dismissed for lack of subject matter jurisdiction, a district court has no discretion to retain the supplemental claims for adjudication. The dismissal means that there never was a valid claim within the court's original jurisdiction to which the state claims may be supplemental.").

Even if this Court were to conclude that plaintiffs' complete failure to plead any valid federal claim did not deprive it of "original jurisdiction," the Court should still decline to exercise supplemental jurisdiction over plaintiffs' state law claims.  State law claims should be dismissed where, as here, "the district court has dismissed all claims over which it has original

jurisdiction." 28 U.S.C. § 1367(c)(3). "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (same analysis under doctrine of pendent jurisdiction). It is clear that retaining jurisdiction in the circumstances of this case would not "promote the values articulated in [*UMW v. Gibbs*, 383 U.S. 715, 726 (1966)]: economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). There would be nothing economical about a trial potentially under the law of twenty different states, and comity would be altogether thwarted by a procedure that requires one federal court in New York to apply those state laws in a case of first impression. Accordingly, this Court should not retain supplemental jurisdiction.

## II. PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.

If the Court decides to exercise supplemental jurisdiction, it should dismiss plaintiffs' state law claims. First, those claims are preempted under federal law. Second, plaintiffs have failed to state a valid claim for nuisance under those state laws.

### A. Plaintiffs' State Law Nuisance Claims Are Preempted Because They Interfere With The Political Branches' Integrated Foreign And Domestic Policy Response To Global Warming.

It has long been settled that, when state and federal law conflict, the state law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). In this case, it could not be clearer that plaintiffs' state nuisance claims conflict with the foreign policy that the President has established and that Congress supports, as well as with the closely related domestic policy on global warming that Congress has adopted. Accordingly, those claims are preempted.

#### 1. Plaintiffs' claims conflict with U.S. foreign policy on global warming.

The Supreme Court has found federal foreign policy has particularly strong preemptive force.  As the Court held just last year, exercises of state power that interfere with the conduct of foreign relations "must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Garamendi*, 123 S. Ct. at 2386, 2392 n.14.  *See also Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.").  Indeed, so strong are the interests of the federal government in the domain of foreign relations that, in *Garamendi*, the Supreme Court held that the President, even when acting "independent" of Congress, can set foreign policy for the Nation that preempts state law.  123 S. Ct. at 2386, 2392 n.14.

The President has plainly set forth a foreign policy for the United States on global warming.  The primary tenets of this policy are two-fold.  First, the President has stated that the United States should work with other nations through international bodies in order to achieve a coordinated response to global warming.  The United States has been a member of an international coalition seeking to redress global warming since 1992, when President George H.W. Bush signed the UNFCCC, which notes that "the global nature of climate change calls for the widest possible cooperation by all countries and their participation in an effective and appropriate international response."  *See* UNFCCC, *Text of Convention* 2 (May 9, 1992), *available at* http://unfccc.int/resource/docs/convkp/conveng.pdf.  In setting forth his foreign policy on global warming, the current President stated that he wishes to continue the nation's participation in the UNFCCC, and, indeed, that he is "committing the United States of America

to work within the United Nations framework and elsewhere to develop . . . an effective and science-based response to the issue of global warming." *See President Bush Discusses Global Climate Change*, *supra*. "[T]he process used to bring nations together to discuss our joint response to climate change is an important one." *Id*. Congress has supported the U.S.'s participation in the UNFCCC; indeed, the Senate ratified the UNFCCC in 1992.

Second, the President has stated that the United States will not require its citizens to reduce carbon dioxide emissions unilaterally. Instead, the solution to global warming must be shouldered by all nations, including developing nations. "[W]e all know the United States cannot solve this global problem alone." *Id*. "[O]ur approach must be based on global participation, including that of developing countries whose net greenhouse gas emissions now exceed those in the developed countries." *Id*. For this reason, the President declared that he opposed the Kyoto Protocol, a treaty that emerged from the UNFCCC that required only developed nations to reduce carbon dioxide emissions.[16] The President concluded, "[t]his is a challenge that requires a 100 percent effort; ours, and the rest of the world's." *Id*. Congress has long been on record in vigorous support of this policy against requiring unilateral carbon dioxide reductions only from the United States and other developed nations. In 1997, the Senate adopted by a 95-0 vote a resolution that declared the Senate's intention not to ratify any international agreement that did not require reductions on the part of developing as well as developed nations. *See* S. Res. 98. Moreover, until President Bush announced his opposition to the Kyoto Protocol,

---

[16] "The Kyoto Protocol was fatally flawed in fundamental ways." *President Bush Discusses Global Climate Change*, *supra*. "[T]he rest of the world emits 80 percent of all greenhouse gases. And many of those emissions come from developing countries." *Id*. "The world's second-largest emitter of greenhouse gases is China. Yet, China was entirely exempt from Kyoto." *Id*. "India [is] among the top emitters. Yet, India was also exempted from the requirements of the Kyoto Protocol." *Id*.

Congress had enacted a restriction in each of its annual appropriations to EPA barring it from implementing the Protocol. *See* Pub. L. No. 105-276, 112 Stat. at 2496; Pub. L. No. 106-74, 113 Stat. at 1080; Pub. L. No. 106-377, 114 Stat. at 1441A-41.

Plaintiffs' invocation of state law in this case would undermine this federal foreign policy. State laws conflict with federal foreign policy whenever they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives" of the policy. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal quotation marks omitted); *accord Garamendi*, 123 S. Ct. at 2393. Plaintiffs in this case invoke state nuisance laws to redress global warming by forcing defendants to reduce their carbon dioxide emissions; plaintiffs' use of these laws clearly "stand[s] as an obstacle" to both aspects of the nation's global warming foreign policy.[17]

First, the adjudication of these state nuisance laws would take place outside the United Nations framework that the President has "committ[ed] the United States of America to work within." *President Bush Discusses Global Climate Change*, *supra*. The Supreme Court has held that state laws that speak to foreign policy issues outside international bodies the federal government is seeking to work within unduly interfere with that foreign policy and are preempted. In *Crosby*, for example, Congress had instructed the President to "cooperate with members of the Association of Southeast Asian Nations (ASEAN) and with other countries

---

[17] Even if the federal government shared plaintiffs' general goal of reducing global warming, that would not render the *means* plaintiffs have selected to achieve their goal—state nuisance laws— consistent with federal foreign policy. The Supreme Court has made it crystal clear that "conflicts are not rendered irrelevant by the State's argument that there is no real conflict . . . because they share the same goals," *Crosby*, 530 U.S. at 379. "The fact of a common end hardly neutralizes conflicting means," *Id*; *accord Garamendi*, 123 S. Ct. at 2393.

having major trade and investment interests in Burma" to devise a proper approach to the oppressive regime that governed that nation. 530 U.S. at 369. Yet, Massachusetts decided to devise its own approach to Burma by refusing to do business with any company that did business with Burma. *Id.* at 368-69. The Supreme Court held that the Massachusetts law "undermine[d] the President's capacity . . . for effective diplomacy." *Id.* at 381. In particular, Massachusetts's decision to tackle the question of Burma outside the ASEAN undermined the President's ability "to take the initiative for the United States among the international community" as well as "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." *Id.* "[H]e is weakened . . . in working together with other nations in hopes of reaching common policy . . . ." *Id.* at 382. In this case, plaintiffs' invocation of state laws to redress the alleged harms of global warming outside the UNFCCC framework would similarly undermine the President's ability to "speak for the Nation with one voice" in order to "reach[] common policy" with other countries. Plaintiffs' state law claims, therefore, are clearly preempted. *Id.* at 381-82.

Second, employing state nuisance laws to address the alleged harms of global warming by requiring defendants to reduce their carbon dioxide emissions would result in precisely the sort of unilateral emission reduction requirements that the President and Congress forcefully rejected in criticizing the Kyoto Protocol. Thus, there is a clear conflict between applying state law in this case and the federal government's multilateral approach to global warming. *See Crosby*, 530 U.S. at 370, 374, 380-82 (holding state law preempted because it conflicted with federal foreign policy to seek a "'*multilateral* strategy to bring democracy to and improve human rights practices and the quality of life in Burma'" (emphasis added)). Moreover, applying state laws to address global warming would reduce the federal government's leverage with other

43

nations; as EPA observed when it declined to regulate carbon dioxide emissions to address global warming, if domestic laws are used to impose unilateral limitations on U.S. carbon dioxide emissions, the President is weakened in his "efforts to persuade key developing countries to reduce the [greenhouse gas] intensity of their economies." 68 Fed. Reg. at 52931. The Supreme Court has repeatedly found that state laws that undermine the federal government's bargaining leverage in this way are preempted. In *Garamendi*, for example, the Court found a California law merely requiring companies to disclose Holocaust-era insurance policies preempted because, "[q]uite simply, if the [California] law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." 123 S. Ct. at 2391 (second alteration in original and internal quotation marks omitted). *See also Crosby*, 530 U.S. at 377 ("[W]e [have] used the metaphor of the bargaining chip . . .; here, the state Act reduces the value of the chips created by the federal statute.").

States and litigants that are unhappy with the federal government's foreign policy on global warming cannot simply go it alone. Instead, "dissatisfaction should be addressed to the President or, perhaps, Congress." *Garamendi*, 123 S. Ct. at 2393. Federal foreign policy must speak with one voice on global warming, and that voice is the President's. As the EPA found when it declined to regulate carbon dioxide emissions to address global climate change, "[u]navoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them." 68 Fed. Reg. at 52931.

### 2. Plaintiffs' claims conflict with the regulatory method to global warming that Congress has chosen.

Plaintiffs' state law nuisance actions interfere not only with the President's management of the Nation's foreign policy, but also with the closely related domestic policy Congress has

adopted on global warming.  As noted above, the Executive Branch began multilateral

negotiations on global warming following legislation in 1987 and 1990 directing the Secretary of

State and the President to do so.  *See supra* at 6.  At the same time, Congress launched a long-

term study of global climate change, *id.*, and enacted major amendments to the CAA in which it

also mandated research, study and other nonregulatory programs related to the possible effects of

carbon dioxide emissions on global warming.  *Supra* at 23-24.  Consistent with the multilateral

approach to emissions reductions that the Executive Branch has pursued and that Congress has

approved through resolutions and appropriations riders, Congress has repeatedly and deliberately

eschewed any substantive regulation of domestic carbon dioxide emissions.  *Id.*

By seeking to impose mandatory restrictions on carbon dioxide emissions, plaintiffs seek

to chart a course that not merely is different from Congress's chosen method of addressing

global warming, but actually conflicts with Congress's policy.  Because plaintiffs' state law

nuisance claims, if allowed, would undermine "'the full purposes and objectives'" and "'natural

effect'" of Congress's policy, *Crosby*, 530 U.S. at 373, they "must yield to the regulation of

Congress."  *Id.* at 373-74.  *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 881-82

(2000) (common-law "no airbag" action preempted; imposing a duty to install airbags "would

have presented an obstacle to the variety and mix of devices" or methods that the Department of

Transportation, through a phased-in strategy, determined most appropriate for automobiles)

(citing *International Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987)).  As indicated, *supra*,

n.17, the fact that plaintiffs may share the same goal as Congress, is irrelevant.  The relevant

inquiry is whether action under state law is at odds with the means Congress has chosen to

advance its goal.  *Crosby*, 530 U.S. at 380-81.  Here, there can be no question that plaintiffs'

request for imposition of emissions limits on selected domestic sources now conflicts with the

calibrated method that Congress has chosen to address carbon dioxide emissions and global warming, *see Geier*, 502 U.S. at 881-82—a calibrated method that dovetails with the President's foreign policy on the same subject.

Accordingly, for all of these reasons, plaintiffs' state law nuisance claims are preempted.[18]

### B.    Plaintiffs Have Failed To State A Claim For Nuisance Under State Law.

Plaintiffs' state law claims also must be dismissed because they fail to allege facts necessary to state a claim for nuisance under those laws.  While they differ slightly, each State's definition of public nuisance is generally consistent with that set forth in the Restatement:[19]

> (1)  A public nuisance is an unreasonable interference with a right common to the general public.
>
> (2)  Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>       (a)  Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>       (b)  whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>       (c)  whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

---

[18] The fact that state nuisance actions to redress global warming are preempted distinguishes them from the state nuisance actions to redress water pollution that the Supreme Court indicated would apply to interstate disputes in the absence of federal common law in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987).

[19]  The principles addressed herein have broad application to plaintiffs' public nuisance claims under the various state laws.  Should any part of this action survive the motions to dismiss, defendants reserve the right to challenge plaintiffs' claims under the specifics of the law of each source state.

*Restatement (Second) of Torts* § 821B (1979).[20]  Plaintiffs apparently seek to rely on section

(2)(a) of the Restatement definition, alleging that defendants' conduct contributes to global

warming, which, they claim, is a significant interference with a public right.  *See* States Compl. ¶

154; OSI Compl. ¶ 93.  Plaintiffs have neither alleged that defendants' conduct is proscribed by

law, nor that defendants' conduct *has* produced a permanent or long-lasting effect and that

defendants knew or should know of that effect.   Nor do the facts pleaded by plaintiffs

demonstrate that defendants' less than 2% contribution of global greenhouse gas emissions has

"produced" a permanent or long-lasting effect.

    A conclusory assertion that defendants' conduct has led to a significant interference with

a public right, or that defendants' emissions have produced a long-lasting effect, however, is not

sufficient.  Plaintiffs must also plead facts to support these conclusions.  Thus, they must plead

facts to show that defendants' conduct is both intentional *and* unreasonable, *or*, if not intentional,

negligent, reckless or abnormally dangerous.  *See Restatement*, *supra*, § 821B cmt. e ("the

defendant is held liable for a public nuisance if his interference with the public right was

intentional or was unintentional and otherwise actionable under the principles controlling

liability for negligent or reckless conduct or for abnormally dangerous activities."); *see also id.*

§ 821A cmt. c., § 822 cmts. a, h.[21]  A nuisance is intentional if the defendant acts with the

_____

[20] *See, e.g.*, *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292,
750 N.E.2d 1097, 1104 (N.Y. 2001); *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142
(Ohio 2002); *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So.2d 648, 664 (Miss. 1995); *Blair
v. Anderson*, 570 N.E.2d 1337, 1339 (Ind. Ct. App. 1991); *Tipler v. McKenzie Tank Lines*, 547
So. 2d 438, 440 (Ala. 1989).
[21] *See also City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1229 (Ind.
2003) (adopting Restatement concept of unreasonable conduct); *Highview N. Apartments v.
County of Ramsey,* 323 N.W.2d 65, 70-71 (Minn. 1982*)* ("there must be some kind of conduct
causing the nuisance harm which is 'wrongful.' . . . This wrongful conduct varies, and may at
times be characterized as intentional conduct, negligence, ultrahazardous activity, violation of a

purpose of causing it or knows that it is certain to result from his conduct.  *See id.* § 825.[22]

"[M]ere knowledge and appreciation of a risk is not the same as the intent to cause injury."

*Finch v. Swingly*, 348 N.Y.S.2d 266, 268 (App. Div. 4th  Dep't 1973).

 The complaints are devoid of any specific factual allegations to demonstrate that

defendants' acts were "intentional" in the manner demanded by the Restatement.  Plaintiffs do

not allege facts to show that defendants have acted with the specific knowledge or substantial

certainty that the alleged nuisance will result *from their conduct*, nor do they allege that

defendants have acted with that purpose.  Similarly, no facts alleged in the complaints support

the conclusion that defendants have acted negligently, recklessly or in an abnormally dangerous

manner.  Instead, the complaints include only bare allegations that defendants "knowingly,

intentionally or negligently" create or contribute to a public nuisance under the various source

state nuisance laws.  *E.g.*, States Compl. ¶ 153; OSI Compl. ¶ 95.  "'Conclusory allegations or

legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to

dismiss.'"  *Smith*, 291 F.3d at 240 (alteration omitted) (quoting *Gebhardt*, 96 F. Supp. 2d at 333).

Plaintiffs' conclusory assertions do not overcome their failure to allege facts supporting claims

of tortious conduct amounting to the creation of a public nuisance.[23]

---

statute or some other tortious activity); *State v. Wright Hepburn Webster Gallery, Ltd.*, 314
N.Y.S.2d 661, 666 (Sup. Ct. 1970) ("the conduct of a lawful business may not be deemed to
constitute a public nuisance unless something is done in the operation thereof which is unlawful
or its maintenance is negligent or improper"), *aff'd*, 323 N.Y.S.2d 389 (App. Div. 1st Dep't
1971).
[22] *See also Hall v. State, Mich. Dep't of Highways & Transp.*, 311 N.W.2d 813, 818 (Mich. Ct.
App. 1981); *Copart Indus., Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 571, 362 N.E.2d
968, 972-73 (1977); *Greentree at Murray Hill Condo. v. Good Shepherd Episcopal Church*, 550
N.Y.S.2d 981, 988 (Sup. Ct. 1989).
[23] Moreover, to the extent the public plaintiffs assert claims "on [their] own behalf to protect
state property," States Compl. ¶¶ 7-14, these claims fail as a matter of law.  As defendants
explain in their separate motion to dismiss the claims of the private plaintiffs, an individual claim

In sum, plaintiffs have not alleged facts sufficient to demonstrate that defendants are liable for a public nuisance. For this reason, plaintiffs' state law nuisance claims should be dismissed on the merits.

## CONCLUSION

For all of the foregoing reasons, defendants respectfully request that the Court grant their motion to dismiss the complaints for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Dated: New York, New York
      September 30, 2004

By: /s/ Steven M. Bierman
    Steven M. Bierman (SB-6615)
    Patrick M. McGuirk (PM-8365)
    SIDLEY AUSTIN BROWN & WOOD LLP
    787 Seventh Avenue
    New York, New York 10019

    -and-

---

for abatement or damages requires a showing of "special injury." *See* Memorandum in Support of Defendants' motion to Dismiss Private Plaintiffs' Complaint. In their capacity as owners of private property, however, the public plaintiffs make no such allegations. The alleged injuries are stated collectively in the complaint for "the plaintiffs and their citizens and residents," States Compl. ¶ 3, and alleged climate changes are inherently the same for all. Indeed, the alleged interference with respect to "the right to public comfort and safety, the right to protection of vital natural resources and public property, and the right to use, enjoy, and preserve the aesthetic and ecological values of the natural world," *id.* ¶ 154, cannot be different in kind for any property owner. Thus, plaintiffs have failed to state a state-law public nuisance claim for injuries to the state-owned property.

Angus Macbeth (AM-5112)
Joseph R. Guerra
Thomas G. Echikson
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, NW
Washington, DC 20005

*Attorneys for Defendants American Electric Power
Company, Inc., American Electric Power Services
Corporation and Cinergy Corp.*

By: /s/ Shawn Patrick Regan
  Shawn Patrick Regan
  HUNTON & WILLIAMS LLP
  200 Park Avenue, 43rd Floor
  New York, New York 10166
  (212) 309-1000

    -and-

  F. William Brownell
  Norman W. Fichthorn
  Allison D. Wood
  HUNTON & WILLIAMS LLP
  1900 K Street, N.W.
  Washington, DC 20006-1109
  (202) 955-1500

    -and-

  Peter S. Glaser
  TROUTMAN SANDERS LLP
  401 Ninth Street, NW, Suite 1000
  Washington, D.C. 20004-2134
  (202) 274-2950

    -and-

Mary K. McLemore
Jaime L. Theriot
TROUTMAN SANDERS LLP
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
(404) 885-3534

*Attorneys for Defendant The Southern Company*

By:    /s/ Harriet A. Cooper
Harriet A. Cooper
Edwin W. Small
Frank H. Lancaster
Todd L. Fulks
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee  37902

*Attorneys for Defendant Tennessee Valley Authority*

By:    /s/ Patrick G. Broderick
Patrick G. Broderick
JONES DAY
222 E. 41st Street
New York, New York  10017-6702

-and-

Thomas E. Fennell
Michael L. Rice
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201

*Attorneys for Defendant Xcel Energy Inc.*