```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
STATE OF CONNECTICUT, et al.,        :
                                     :
                Plaintiffs,          :
                                     :
        -against-                    :
                                     :
AMERICAN ELECTRIC POWER              :
COMPANY, INC., et al.,               :
                                     :
                Defendants.          :
------------------------------------x
OPEN SPACE INSTITUTE, et al.,        :
                                     :
                Plaintiffs,          :
                                     :    04 Civ. 5669 (LAP)
        -against-                    :    04 Civ. 5670 (LAP)
                                     :
AMERICAN ELECTRIC POWER              :
COMPANY, INC., et al.,               :    OPINION AND ORDER
                                     :
                Defendants.          :
------------------------------------x
```

LORETTA A. PRESKA, United States District Judge:

The Framers based our Constitution on the idea that a separation of powers enables a system of checks and balances, allowing our Nation to thrive under a Legislature and Executive that are accountable to the People, subject to judicial review by an independent Judiciary. See Federalist Paper No. 47 (1788); U.S. Const. arts. I, II, III. While, at times, some judges have become involved with the most critical issues affecting America, political questions are not the proper domain of judges. See, e.g., Baker v. Carr, 369 U.S. 186 (1962); Nixon v. United States, 506 U.S. 224 (1993). Were judges to resolve political questions, there would be no check on their resolutions because the

Judiciary is not accountable to any other branch or to the People.  Thus, when cases present political questions, "judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances." Nixon, 506 U.S. at 234-35.  As set out below, cases presenting political questions are consigned to the political branches that are accountable to the People, not to the Judiciary, and the Judiciary is without power to resolve them.  This is one of those cases.

## BACKGROUND[1]

The States of Connecticut, New York, California, Iowa, New Jersey, Rhode Island, Vermont, and Wisconsin and the City of New York (the "State Plaintiffs") and the Open Space Institute, Inc. ("OSI"), the Open Space Conservancy, Inc., and the Audubon Society of New Hampshire (the "Private Plaintiffs") (collectively, "Plaintiffs") bring the above-captioned actions against American Electric Power Company, Inc., American Electric Power Service Corporation (together, "AEP"), the Southern Company ("Southern"), Tennessee Valley Authority ("TVA"), Xcel Energy Inc. ("Xcel"), and Cinergy Corporation ("Cinergy") (collectively, "Defendants") under federal common law or, in the alternative,

---

[1] For the purposes of these motions, the allegations of the complaints are accepted as true. See Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000); Desiderio v. National Ass'n of Secs. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).

state law, to abate what Plaintiffs describe as the "public nuisance" of "global warming." State Compl. ¶ 1;[2] OSI Compl. ¶ 1.[3] Defendants now move to dismiss the complaints for, <u>inter alia</u>, lack of jurisdiction and failure to state a claim upon which relief can be granted. For the reasons set forth below, Defendants' motions are granted.

The State Plaintiffs, claiming to represent the interests of more than 77 million people and their related environments, natural resources, and economies, and the Private Plaintiffs, non-profit land trusts, bring these federal common law public nuisance actions to abate what they allege to be Defendants' contributions to the phenomenon commonly known as global warming. State Compl. ¶¶ 1, 146; OSI Compl. ¶¶ 1, 92, 103. Plaintiffs assert that the Defendants collectively emit approximately 650 million tons of carbon dioxide annually, State Compl. ¶ 2; OSI Compl. ¶ 3, that carbon dioxide is the primary greenhouse gas, State Compl. ¶ 1; OSI Compl. ¶ 2, and that greenhouse gases trap atmospheric heat and cause global warming, State Compl. ¶ 1; OSI Compl. ¶ 2.

As part of their venue allegations, Plaintiffs maintain that global warming will cause irreparable harm to property in

---

[2]"State Compl." refers to the complaint filed by the State Plaintiffs (captioned 04 Civ. 5669 (LAP)) on July 22, 2004.

[3]"OSI Compl." refers to the complaint filed by the Private Plaintiffs (captioned 04 Civ. 5670 (LAP)) on July 22, 2004.

New York State and New York City and that it threatens the health, safety, and well-being of New York's citizens, residents, and environment. State Compl. ¶¶ 2, 20, 24, 26, 30, 34, 159; OSI Compl. ¶¶ 80-88, 93.

According to the complaints, Defendants "are the five largest emitters of carbon dioxide in the United States" and their emissions "constitute approximately one quarter of the U.S. electric power sector's carbon dioxide emissions." State Compl. ¶ 98; OSI Compl. ¶ 55. According to the complaints, U.S. electric power plants are responsible for "ten percent of worldwide carbon dioxide emissions from human activities." State Compl. ¶ 100; OSI Compl. ¶ 53.

State Plaintiffs assert that global warming has already occurred in the form of a documented increase in average temperatures in the United States of between .74 and 5 degrees Fahrenheit since 1900, State Compl. ¶¶ 103, 104, and a decline in snowfall and the duration of snow cover in recent decades, State Compl. ¶ 105, 106. In addition to what State Plaintiffs say are these already-documented climate changes, the United States Environmental Protection Agency (the "EPA") projects an increase in temperature of approximately 4 to 5 degrees by the year 2100. State Compl. ¶ 106. Private Plaintiffs assert that the Intergovernmental Panel on Climate Change projects that the global average surface air temperature will increase

4

approximately 2.5 to 10.4 degrees Fahrenheit from the year 1990 to 2100. OSI Compl. ¶ 61.

Plaintiffs say the natural processes that remove carbon dioxide from the atmosphere now are unable to keep pace with the level of carbon dioxide emissions. State Compl. ¶ 87; OSI Compl. ¶ 51.  As a result, Plaintiffs allege, carbon dioxide levels have increased approximately 34% since the industrial revolution began, causing increased temperatures. State Compl. ¶ 88; OSI Compl. ¶ 50.  Plaintiffs further allege that because the planet's natural systems take hundreds of years to absorb carbon dioxide, Defendants' past, present, and future emissions will remain in the atmosphere and contribute to global warming for many decades and, possibly, centuries. State Compl. ¶ 102; OSI Compl. ¶ 56. Although Plaintiffs acknowledge that there is some dispute about the rate and intensity of the process of global climate change, Plaintiffs say official reports from American and international scientific bodies demonstrate the clear scientific consensus that global warming has begun, is altering the natural world, and will accelerate over the coming decades unless action is taken to reduce emissions of carbon dioxide. State Compl. ¶¶ 80, 81; OSI Compl. ¶¶ 44-47.

Congress has recognized that carbon dioxide emissions cause global warming and that global warming will have severe adverse impacts in the United States, but it has declined to

impose any formal limits on such emissions. See, e.g., The Global Climate Protection Act of 1987, P.L. 100-204, Title XI, §§1102-03, reprinted at 15 U.S.C. § 2901 note.  However, Congress and the Executive Branch have taken several steps to better understand and address the complex issue of global warming.  As early as 1978, Congress established a "national climate program" to improve understanding of global climate change through research, data collection, assessments, information dissemination, and international cooperation. See National Climate Program Act of 1978, 15 U.S.C. §§ 2901, et seq.  Two years later, in the Energy Security Act, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (1980), Congress directed the Office of Science and Technology Policy to engage the National Academy of Sciences in a study of the "projected impact, on the level of carbon dioxide in the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities" authorized by the Energy Security Act.  In the Global Climate Protection Act of 1987, Congress directed the Secretary of State to coordinate U.S. negotiations concerning global climate change. See 15 U.S.C. § 2901 note; see also id. § 2952(a) (directing the President and Secretary of State in 1990 to "initiate discussions" with other nations for agreements on climate research).

In 1990, Congress enacted the Global Change Research Act, 15 U.S.C. §§ 2931-2938, which established a ten-year research program for global climate issues, id. § 2932, directed the President to establish a research program to "improve understanding of global change," id. § 2933, and provided for scientific assessments every four years that "analyze[] current trends in global change," id. § 2936(3). Congress also established a program to research agricultural issues related to global climate change, Pub. L. No. 101-624, tit. XXIV, § 2402, 104 Stat. 4058, 4058-59 (1990), and, two years later, directed the Secretary of Energy to conduct several assessments related to greenhouse gases and report to Congress, Energy Policy Act of 1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002.

In 1992, as a result of the negotiations authorized by the Global Climate Protection Act of 1987, President George H. W. Bush signed, and the Senate ratified, the United Nations Framework Convention on Climate Change ("UNFCCC"), which brought together a coalition of countries to work toward a coordinated approach to address the international issue of global warming. Following ratification of the UNFCCC, member nations negotiated the Kyoto Protocol, which called for mandatory reductions in the greenhouse gas emissions of developed nations. See UNFCCC, Kyoto Protocol (Dec. 11, 1997).

Although President William Jefferson Clinton signed the Kyoto Protocol, it was not presented to the Senate, which formally expressed misgivings over the prospect that the potential economic burdens of carbon dioxide reductions would be shouldered exclusively by developed nations, such as the United States. S. Res. 98, 105th Cong. (1997) (resolving by vote of 95-0 to urge the President not to sign any agreement that would result in serious harm to the economy or that did not include provisions regarding the emissions of developing nations). Thereafter, Congress passed a series of bills that affirmatively barred the EPA from implementing the Protocol. See Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106- 377, 114 Stat. 1141, 1441A-41 (2000). The EPA has ruled that the Clean Air Act does not authorize carbon dioxide regulation. Control of Emissions from New Highway Vehicles and Engines, 68 Fed. Reg. 52,922 (Sept. 8, 2003).

President George W. Bush opposes the Protocol because it exempts developing nations who are major emitters, fails to address two major pollutants, and would have a negative economic impact on the United States. See Transcript, President Bush Discusses Global Climate Change (Jun. 11, 2001). Instead, the policy of the current administration "emphasizes international cooperation and promotes working with other nations to develop an efficient and coordinated response to global climate change,"

8

which the EPA describes as a "prudent," "realistic and effective long-term approach to the global climate change issue." 68 Fed. Reg. at 52933.

Here, to curtail Defendants' contribution to global warming, Plaintiffs "seek an order (i) holding each of the Defendants jointly and severally liable for contributing to an ongoing public nuisance, global warming, and (ii) enjoining each of the Defendants to abate its contribution to the nuisance by capping its emissions of carbon dioxide and then reducing those emissions by a specified percentage each year for at least a decade." State Compl. ¶ 6; OSI Compl. ¶ 10. According to Plaintiffs, the unspecified reductions they seek "will contribute to a reduction in the risk and threat of injury to the plaintiffs and their citizens and residents from global warming." State Compl. ¶ 148; OSI Compl. ¶ 90.

By way of a variety of motions, supported by Unions for Jobs and the Environment and opposed by the Association of the Bar of the City of New York, as amici, Defendants move to dismiss the complaints against them on several grounds. First, Defendants contend that Plaintiffs have failed to state a claim upon which relief can be granted because: (1) there is no recognized federal common law cause of action to abate greenhouse gas emissions that allegedly contribute to global warming; (2) separation of powers principles preclude this Court from

adjudicating these actions; and (3) Congress has displaced any federal common law cause of action to address the issue of global warming.  Second, Defendants contend that this Court lacks jurisdiction over Plaintiffs' claims because:  (1) Plaintiffs do not have standing to sue on account of global warming and (2) Plaintiffs' failure to state a claim under federal law divests the Court of § 1331 jurisdiction. Def. Memo. at 27.[4]  In addition to advancing these primary arguments, Defendants Southern, TVA, Xcel, and Cinergy move to dismiss for lack of personal jurisdiction, and TVA moves to dismiss because, as an agency and instrumentality of the United States, it claims that it cannot be sued for a tort when the subject of the lawsuit is the actions it performs as part of its discretionary functions. TVA Memo. at 11-12.[5]

## DISCUSSION

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires dismissal of complaints that are not legally sufficient. Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  Rule

---

[4]"Def. Memo." refers to the Memorandum of Law in Support of Defendants' Motions to Dismiss the Complaints for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted filed on September 30, 2004.

[5]"TVA Memo." refers to the Memorandum of Law in Support of Tennessee Valley Authority's Motions to Dismiss on Federal Discretionary Function Grounds filed on September 30, 2004.

10

12(b)(1) requires dismissal when "the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113 (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)). Under both rules, as noted above, this Court must accept the allegations of the complaints as true and construe all reasonable inferences in favor of Plaintiffs. See supra note 1.

Because federal courts are courts of limited jurisdiction, whether a court has jurisdiction is an issue generally to be addressed first. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 95 (1998). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Id. at 94-95 (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). "[E]ither the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party." Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 215 (1974) (internal citations omitted).

The threshold jurisdictional question in this case is whether the complaints raise non-justiciable political questions

that are beyond the limits of this Court's jurisdiction.[6] Defendants argue that "separation-of-powers principles foreclose recognition of the unprecedented 'nuisance' action plaintiffs assert," see Def. Reply Memo. at 7,[7] which I take to be an argument that Plaintiffs raise a non-justiciable political question. At oral argument, counsel for AEP and Cinergy argued that by "asking this Court to resolve an environmental policy question with sweeping implications for the nation's economy, its foreign relations, and even potentially its national security," Plaintiffs "have put the cart before the horse." Tr. 6:1-6:5; 11:11.[8] Defendants AEP and Cinergy also note that the Supreme Court imposes on courts "an unflagging duty" to exercise their jurisdiction appropriately and refrain from resolving questions of high policy, which are for the political branches. Tr. 10:22-

---

[6]The extraordinary allegations and relief sought in this case render it one in which an analysis of Plaintiffs' standing would involve an analysis of the merits of Plaintiffs' claims. For example, determining causation and redressibility in the context of alleged global warming would require me to make judgments that could have an impact on the other branches' responses to what is plainly a political question. Accordingly, because the issue of Plaintiffs' standing is so intertwined with the merits and because the federal courts lack jurisdiction over this patently political question, I do not address the question of Plaintiffs' standing.

[7]"Def. Reply Memo." refers to the Reply in Support of Defendants' Motions to Dismiss the Complaints for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted filed on December 17, 2004.

[8]"Tr." refers to the transcript of the oral arguments held on August 12, 2005.

12

10:25; 11:17-11:19. Accordingly, this issue will be addressed first.

To determine if a case is justiciable in light of the separation of powers ordained by the Constitution, a court must decide "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." Baker v. Carr, 369 U.S. 186, 198 (1962). Six situations have been recognized as indicating the existence of a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Vieth v. Jubelirer, 541 U.S. 267, 277-78 (2004) (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)). Although several of these indicia have formed the basis for finding that Plaintiffs raise a non-justiciable political question, the third indicator is particularly pertinent to this case.

As noted above, a non-justiciable political question exists when a court confronts "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." Vieth, 541 U.S. at 278. As the Supreme Court has recognized, to resolve typical air pollution cases, courts must strike a balance "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes [will] retard industrial development with attendant social costs." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 847 (1984). In this case, balancing those interests, together with the other interests involved, is impossible without an "initial policy determination" first having been made by the elected branches to which our system commits such policy decisions, viz., Congress and the President.

Plaintiffs advance a number of arguments why theirs is a simple nuisance claim of the kind courts have adjudicated in the past, but none of the pollution-as-public-nuisance cases[9] cited by Plaintiffs has touched on so many areas of national and

---

[9] Plaintiffs rely on, for example, New Jersey v. New York City, 283 U.S. 473, 476-77 (1931) (involving garbage dumped into the ocean that polluted New Jersey beaches); Georgia v. Tennessee Copper Co., 206 U.S. 230, 236 (1907) (involving a company discharging noxious gas that threatened forests, orchards, and crops in five counties); State of New York v. Shore Realty Corp., 758 F.2d 1032, 1038 (2d Cir. 1984) (involving more than eleven tanks and 400 drums of substances that are considered "hazardous" within the meaning of CERCLA).

14

international policy.  The scope and magnitude of the relief
Plaintiffs seek reveals the transcendently legislative nature of
this litigation.  Plaintiffs ask this Court to cap carbon dioxide
emissions and mandate annual reductions of an as-yet-unspecified
percentage. State Compl., Prayer for Relief ¶ b.  Such relief
would, at a minimum, require this Court to: (1) determine the
appropriate level at which to cap the carbon dioxide emissions of
these Defendants; (2) determine the appropriate percentage
reduction to impose upon Defendants; (3) create a schedule to
implement those reductions; (4) determine and balance the
implications of such relief on the United States' ongoing
negotiations with other nations concerning global climate change;
(5) assess and measure available alternative energy resources;
and (6) determine and balance the implications of such relief on
the United States' energy sufficiency and thus its national
security--all without an "initial policy determination" having
been made by the elected branches.

Defendants have set forth just a few of the difficult
"initial policy determination[s]" that would have to be made by
the elected branches before any court could address these issues:

> [G]iven the numerous contributors of
> greenhouse gases, should the societal costs of
> reducing such emissions be borne by just a
> segment of the electricity-generating industry
> and their industrial and other consumers?
>
> Should those costs be spread across the entire
> electricity-generating industry (including

15

utilities in the plaintiff States)? Other industries?

What are the economic implications of these choices?

What are the implications for the nation's energy independence and, by extension, its national security?

Def. Memo. at 7-8.

If there is any doubt as to the complexity of the "initial policy determination[s]" that must be made by the elected branches before a non-elected court can properly adjudicate a global warming nuisance claim, one need only look to the statements of the EPA, the agency in which "Congress has vested administrative authority" over the "technically complex area of environmental law," New England Legal Foundation v. Costle, 666 F.2d 30, 33 (2d Cir. 1981), and which has been grappling with the proper approach to the issue of global climate change for years. For example:

> It is hard to imagine any issue in the environmental area having greater "economic and political significance" than regulation of activities that might lead to global climate change. 68 Fed. Reg. 52922, 52928 (Sep. 8, 2003).

> The issue of global climate change . . . has been discussed extensively during the last three Presidential campaigns; it is the subject of debate and negotiation in several international bodies; and numerous bills have been introduced in Congress over the last 15 years to address the issue. 68 Fed. Reg. at 52928.

16

> Unilateral [regulation of carbon dioxide emissions in the United States] could also weaken U.S. efforts to persuade key developing countries to reduce the [greenhouse gas] intensity of their economies. 68 Fed. Reg. at 52931.
>
> Unavoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them. 68 Fed. Reg. at 52931.
>
> Virtually every sector of the U.S. economy is either directly or indirectly a source of [greenhouse gas] emissions, and the countries of the world are involved in scientific, technical, and political-level discussions about climate change. 68 Fed. Reg. at 52928.

Considering these statements in no way undermines the longstanding principle that the judicial branch, not the political branches, determines, on a case-by-case basis, when a political question is raised. Looking at the past and current actions (and deliberate inactions) of Congress and the Executive within the United States and globally in response to the issue of climate change merely reinforces my opinion that the questions raised by Plaintiffs' complaints are non-judiciable political questions.

The parties dispute what effect, if any, the relief sought by Plaintiffs would have on United States foreign relations. Plaintiffs contend that there would no effect because the "[o]fficial United States policy is to reduce domestic

17

emissions." Pl. Opp. at 20.[10]  Plaintiffs cite, inter alia, EPA and DOE's promotion of voluntary efforts to reduce greenhouse gas emissions, the President's statement that "[we] can make great progress in reducing emissions, and we will.  Yet, even that isn't enough," Congress' commissioning of research on technologies to reduce carbon dioxide emissions, and the UNFCCC's references to limiting emissions. Pl. Opp. at 21.  However, official United States policy is expressed by statutes and treaties in force, not press releases.  And "[a]s Justice Frankfurter observed, in interpreting a statute, '[o]ne must . . . listen attentively to what it does not say.'" Commonwealth of Mass. v. United States EPA, 2004 WL 2584896, at *11 (D.C. Cir. Nov. 2, 2004) (citing Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 536 (1947)).  The explicit statements of Congress and the Executive on the issue of global climate change in general and their specific refusal to impose the limits on carbon dioxide emissions Plaintiffs now seek to impose by judicial fiat confirm that making the "initial policy determination[s]" addressing global climate change is an undertaking for the political branches.

---

[10]"Pl. Opp." refers to the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaints for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted filed on November 19, 2004.

Because resolution of the issues presented here requires identification and balancing of economic, environmental, foreign policy, and national security interests, "an initial policy determination of a kind clearly for non-judicial discretion" is required. <u>Vieth</u>, 541 U.S. at 278 (quoting <u>Baker</u>, 369 U.S. at 212). Indeed, the questions presented here "uniquely demand single-voiced statement of the Government's views." <u>Baker</u>, 369 U.S. at 211. Thus, these actions present non-justiciable political questions that are consigned to the political branches, not the Judiciary.

## CONCLUSION

For the reasons set forth above, the complaints are dismissed. The Clerk of the Court shall mark these actions closed and all pending motions denied as moot.

SO ORDERED

September 15, 2005

*Loretta A Preska*
Loretta A. Preska, U.S.D.J.